# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRED STEVENS, Plan Administrator, in his capacity as Assignee of Bank Litigation Claims from 369 Holders of Allowed Class 4 Claims in the Marshall "Eight Percent Fund"; TIMOTHY AND BETH GREENWOOD; and DARLENE AND WAYNE STETSON, individually and on behalf of all others similarly situated, | Case No.  5:25-cv-1256 (AJB/TWD) |

Plaintiffs,

v.

BERKSHIRE BANK, a Massachusetts trust company, n/k/a Beacon Bank & Trust,

Defendant.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Respectfully submitted,

Peiffer Wolf Carr
 Kane Conway & Wise LLP
935 Gravier Street, # 1600
New Orleans, LA 70112
Telephone: (504) 523-2434

Silver Law Group
11780 W. Sample Road
Coral Springs, FL 33065
Telephone: (954) 755-4799

Fox Rothschild LLP
101 Park Avenue, 17th Floor
New York, NY 10178
Telephone: (212) 878-7900

*Attorneys for the Noteholder Investors*

*Special Litigation Counsel
for the Plan Administrator &
Assignee*

176644894.1

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

A.    NATURE OF ACTION ................................................................................................ 1

B.    PARTIES ..................................................................................................................... 7

C.    JURISDICTION AND VENUE ................................................................................. 9

D.    BANKRUPTCY PROCEEDINGS ............................................................................. 9

E.    GENERAL ALLEGATIONS ................................................................................... 12

        I.       Berkshire Bank's Know Your Customer Duties under Federal law ..................... 12

        II.      Berkshire Bank performs KYC on Marshall and classifies him as a High-Risk
               Business Customer. ............................................................................................. 17

        III.     Marshall's Fraudulent Investment Scheme ........................................................ 21

        IV.    Berkshire Bank gains knowledge of Marshall's fraudulent investment scheme
               and renders substantial assistance thereto. ......................................................... 24

F.    CLASS ACTION ALLEGATIONS .......................................................................... 38

G.    CLAIMS AGAINST BERKSHIRE BANK ............................................................. 41

    COUNT I AIDING AND ABETTING CONVERSION ................................................... 41

    COUNT II AIDING AND ABETTING FRAUD ............................................................. 43

    COUNT III AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY ........... 44

    COUNT IV UNJUST ENRICHMENT ........................................................................... 46

H.    RESERVATION OF RIGHTS .................................................................................. 47

I.    DEMAND FOR JURY TRIAL ................................................................................ 47

i

Plaintiffs FRED STEVENS ("**Stevens**," "**Plan Administrator**," or "**Assignee**"), administrator of the confirmed Joint Plan of Liquidation in the bankruptcy case of M. Burton Marshall a/k/a Burt Marshall a/k/a Miles Burton Marshall ("**Marshall**" or "**Debtor**," and collectively with Miles B. Marshall Inc., the "**Debtors**"), in his capacity as Assignee of Bank Litigation Claims from 369 Holders of Allowed Class 4 Claims in the Marshall "Eight Percent Fund", TIMOTHY and BETH GREENWOOD (the "**Greenwoods**") and DARLENE and WAYNE STETSON (the "**Stetsons**," and together with the Greenwoods, the "**Noteholder Investors**"), individually and on behalf of all others similarly situated, by and through their respective undersigned counsel, hereby sue BERKSHIRE BANK n/k/a Beacon Bank & Trust (**"Berkshire Bank"**), and allege as follows:

### A.     NATURE OF ACTION

1.      This is an action against Berkshire Bank for aiding and abetting conversion, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and unjust enrichment. All of the foregoing occurred in furtherance of, and in connection with, a nearly $100 million Ponzi scheme perpetrated by Marshall. That Marshall operated a Ponzi scheme is not an allegation—it is a fact previously determined by the Bankruptcy Court.

2.      Consistent therewith, Marshall was arrested on June 9, 2025, following the unsealing of a 49-count indictment issued by New York State Attorney General Letitia James ("**Indictment**"). The Indictment charges Marshall with securities fraud, grand larceny, and a scheme to defraud in the first degree.

3.      Hundreds of local victims lost most or all of their life savings due to Marshall's actions, which were primarily conducted through his own individual checking account at Berkshire Bank. These losses could not and would not have occurred without Berkshire Bank's actual knowledge and substantial assistance to Marshall in furtherance of his Ponzi scheme.

176644894.1

4.      As detailed below, Berkshire Bank had actual knowledge of Marshall's wrongdoing during the period 2015 through 2023.  Upon information and belief, Marshall became a Berkshire Bank customer in or about 2015 after he was forced out of a different bank due to the same pattern of suspicious account activity deemed violative of Bank Secrecy Act/Anti-Money Laundering laws ("**BSA/AML**"), policies, and procedures.  That bank even went so far as to warn Berkshire Bank that Marshall "may be running a Ponzi scheme."  Although Berkshire Bank had knowledge of Marshall's unlawful activities before and after the prior bank's warning, it chose to retain him as a customer so that it could continue to profit from their substantial depository account relationship.  Berkshire Bank's failures to close the Marshall accounts and to report him to law enforcement authorities were contrary to federal law and the bank's own policies and procedures, and enabled Marshall to continue his Ponzi scheme that caused tens of millions of dollars in losses to his innocent investor victims.

5.      From 2015 through 2023, Marshall maintained an account in his individual name at Berkshire Bank (the "**2301 Account**") along with six other accounts titled in both his individual name and the name of a "doing business as" sole proprietorship. Each of the 49 counts included in the Indictment charges conduct that occurred during the time Marshall banked exclusively with Berkshire Bank.

6.      At the time the Marshall accounts were opened, Berkshire Bank determined the intended purpose for, and anticipated use, of those accounts as required by law.  Berkshire Bank also, as required by law, conducted substantial due diligence with regard to the identity of the account holder (i.e., Marshall), the nature of his business activities, the source of his revenue, anticipated annual revenue, anticipated annual expenses, anticipated volume of transactions, and anticipated types of transactions.

7.      According to the New York State Office of the Attorney General, Marshall's liabilities exceeded his assets by an astonishing $40 million around this time.

8.      Thereafter, pursuant to legal and regulatory requirements, Berkshire Bank regularly monitored and performed heightened scrutiny of transactions in the Marshall accounts through use of its sophisticated account activity monitoring systems, including Verafin, Abrigo, and IBS, and personnel trained in the use of those systems.

9.      While Berkshire Bank required Marshall to open separate accounts for each "doing business as" account, it continuously allowed him to commingle the funds in such accounts by sweeping them from the "doing business as" accounts to the account titled solely in his individual name, the 2301 Account.

10.     As the following chart illustrates, Marshall's Ponzi scheme ran over $211 million in transactions through his 2301 Account in the period 2015 through 2023:

| Bank Inflows/Outflows by Year | | | |
|---|---|---|---|
| Year | Inflows ($) | Outflows ($) | Sum of Inflows/Outflows ($) |
| 2023 | 3,529,651 | 3,945,777 | 7,475,429 |
| 2022 | 14,324,126 | 14,671,904 | 28,996,029 |
| 2021 | 13,842,277 | 13,135,529 | 26,977,806 |
| 2020 | 13,835,432 | 13,818,759 | 27,654,191 |
| 2019 | 12,549,860 | 12,547,969 | 25,097,829 |
| 2018 | 12,028,405 | 12,616,889 | 24,645,294 |
| 2017 | 12,859,983 | 12,930,608 | 25,790,591 |
| 2016 | 13,055,244 | 12,321,851 | 25,377,096 |
| 2015 | 9,289,066 | 9,839,422 | 19,128,489 |
| Total | 105,314,044 | 105,828,708 | 211,142,753 |

11.     Although Berkshire Bank had a common law, statutory and regulatory duty to detect and terminate fraudulent, illicit, and potentially criminal banking activities in the Marshall accounts,

it permitted highly irregular and suspicious banking transactions to occur repeatedly, many of which had no legitimate business purpose.

12.    For instance, Berkshire Bank knew in February 2018 (at the latest) that Marshall was actively soliciting investments and funneling the money through his accounts, primarily the 2301 Account.  Berkshire Bank allowed Marshall to funnel tens of millions of dollars in investment funds through his accounts even though it was aware Marshall was not licensed to sell investments or provide investment advice and that such activity was inconsistent with his customer profile. Berkshire Bank also allowed Marshall to funnel the investment funds through his accounts even though it knew that his liabilities—almost all of which were tied to the investments he sold—exceeded his assets by tens of millions of dollars at any particular time.

13.    Not surprisingly, Marshall's significant transaction activity triggered numerous Bank Secrecy Act ("**BSA**") and other alerts on Berkshire Bank's sophisticated account activity monitoring systems from at least 2017 through 2023.[1] This was a consistent pattern—Marshall's transaction activity triggered an average of one BSA alert approximately every six (6) weeks, and other alerts an average of once every five (5) weeks.

14.    Throughout their banking relationship, Berkshire Bank knew that Marshall was selling unregistered promissory notes, and depositing large quantities of cash raised from unwitting investors into his 2301 Account on a regular or routine basis. Berkshire Bank knew that Marshall was commingling the investment funds with revenue from Marshall's other businesses and Marshall's personal funds. Berkshire Bank also knew that Marshall lacked the cash flow required to satisfy the

---

[1] Federal regulations promulgated under the Bank Secrecy Act require compliance systems to alert the bank as to unusual or irregular banking activities by its customers that warrant further scrutiny as potential violations of federal anti-money laundering laws (AML) . Berkshire Bank therefore continuously monitors customer account activity as outlined by established procedures, including reviewing complex and complicated alerts generated from its fraud detection software platforms. The bank's fraud detection software automatically reviews transactions against customers' backgrounds and transaction histories, compares account activity against AML and other compliance red flags, and automatically detects and analyzes abnormal or risky behavior. When the software identifies activity warranting further review or escalation, it alerts bank personnel.

outstanding promissory notes and depended on future investment dollars to satisfy his payment obligations. Make no mistake—these were not mere "red flags" that Berkshire could or should have detected. Specific reports disclosed this information to Berkshire on a nearly real-time basis. In short, throughout their banking relationship, Berkshire Bank possessed actual knowledge that Marshall was running a Ponzi scheme.

15.     Marshall's scheme was so obvious that another bank—a bank that Marshall was no longer doing business with—even sent Berkshire an email warning that Marshall was using his Berkshire Bank accounts to perpetrate a Ponzi scheme. Specifically, a Senior AML/Fraud Investigator with NBT Bancorp Inc. ("**NBT Bank**") sent the following email to Berkshire Bank's AVP, Security & Fraud Investigations:

> Hi Jeanne,
>
> I just wanted to pass this along as we have seen some activity from [M Burton Marshall] who we believe *may be running a Ponzi scheme*.  He appears to have an account with Berkshire Bank as well as a number of other financial institutions. *We see a lot of money coming from him to individuals for "interest payments" etc*.  He bills himself as some sort of financial advisor for individuals around the North Country. If you want to give me a call I could provide more details to you.  I don't want to share too much in email as I know your system and mine don't play nice when I try to send you encrypted emails.[2]

16.     Marshall did most of his banking at Berkshire Bank's Oriskany Falls branch. Employees at this branch were aware of Marshall's activity and consistently willing to look the other way. However, Berkshire Bank had announced it would be closing that branch in October 2021 and was worried it would be losing Marshall as a customer.  So Berkshire Bank found another way to assist Marshall's scheme: by tasking a private banker/MyBankers with the responsibility of retaining Marshall as a customer and incentivizing Marshall to stay with the Bank by providing a scanner that enabled him to remotely deposit up to $300,000 in checks *per day*.

---

[2] Unless indicated otherwise, emphasis is added.

17.     Years later, Berkshire Bank's BSA Manager made a belated entry on an internal investigation report with a "Resolved Date" of "10-Aug-2022" stating that the Bank "currently do[es] not see signs of any account being used as a Ponzi scheme.  Account activity appears to be reasonable" on June 24, 2024.  Curiously, this 2024 entry on a report that had been resolved in 2022 was made a mere twelve days after the Plan Administrator publicly filed compelling evidence of Marshall's Ponzi scheme in the Bankruptcy Case.  This retroactive "papering over" of a purported investigation further evidences Berkshire Bank's desire to conceal its own misconduct—and  notably, the BSA Manager's conclusion is surrounded by five text boxes containing the word "Redacted" therein.

18.     Marshall and Berkshire Bank were the only parties who had knowledge of the full financial picture in terms of the scope and magnitude of investment funds flowing through the Marshall accounts from 2015 through 2023.

19.     Berkshire Bank substantially assisted Marshall's fraud, misuse, and misappropriation of assets by allowing the accounts to remain open, by accepting deposits necessary to complete victims' purchase of Marshall's promissory notes, and by processing numerous deposits and disbursements of investor funds from the Marshall accounts. Berkshire Bank's actions went far beyond the mere depositary services associated with a typical checking account—and Berkshire Bank knew it every step of the way.

20.     Berkshire Bank failed to report Marshall to law enforcement authorities or shut down his accounts prior to 2023 purely for business reasons.  Cash deposits are the lifeblood of a bank, just like they are the lifeblood of a Ponzi scheme. In its SEC Form 10-K filed on March 3, 2025, Berkshire Bank acknowledged that deposit accounts are "the major source of funds for the bank's lending and investment activities." Berkshire Bank uses customer deposits to make loans to third parties and to invest in various opportunities in order to generate more money for the bank.  As customer deposits

increase, so too does the bank's profile as an attractive acquisition target.[3]  Berkshire Bank also makes money by charging customers fees on their deposit accounts including overdraft fees, interchange fees related to debit card usage, service charges, and other miscellaneous transactions and convenience services sold to customers.

21.     Berkshire Bank knowingly pursued its business objective of maximizing assets held, and to generate substantial fees, charges, interest, and other forms of revenue while hundreds of innocent investor victims were losing tens of millions of dollars.

22.     Berkshire Bank's knowing substantial assistance to Marshall in running a Ponzi scheme has caused significant damages to Marshall's victims, approaching nearly $100 million. These victims are not wealthy or sophisticated investors. They worked hard and thought they were saving for their future—which is now very much in jeopardy, because of Berkshire Bank's greed. Unfortunately, as the New York State Attorney General's Office confirmed when it unsealed Marshall's Indictment, most of these investors lost their life savings.

**B.     PARTIES**

23.     Plaintiff Fred Stevens is a citizen of the State of New York.  Stevens brings this suit in his capacity as Assignee of Bank Litigation Claims from 369 Holders of Allowed Class 4 Claims in the Marshall "Eight Percent Fund" and for the collective benefit of such creditors.  Marshall likewise is, (and was at all relevant times), a citizen of the State of New York.

24.     Plaintiffs Timothy and Beth Greenwood (the "**Greenwoods**") are citizens of the State of New York.   The Greenwoods loaned $90,000 to Marshall on March 22, 2022 and received an

---

[3] Indeed, Berkshire Bank's parent company (Berkshire Hills Bancorp, Inc.) issued a Press Release on December 16, 2024 announcing its entry into a definitive agreement pursuant to which Brookline Bancorp, Inc. (the parent company of Brookline Bank, Bank Rhode Island, and PCSB Bank) would merge with and into Berkshire in an all-stock transaction valued at approximately $1.1 billion.  In connection with the planned merger, Berkshire also announced that it has entered into subscription agreements with investors for $100 million of Berkshire common stock to raise capital to support the merger.  Upon information and belief, Berkshire Bank failed to fully disclose Plaintiffs' allegations concerning its actions in aiding and abetting Marshall's Ponzi scheme to shareholders or regulators in seeking approval of the merger. Berkshire Bank's *modus operandi* appears to be "silence for the sake of profits".

unsecured 30-day demand note bearing interest at the rate of 8% per annum from Marshall in exchange therefor (Note #4992). The Greenwoods opted to receive monthly interest payments from Marshall. The Greenwoods lost most or all of their investment when the scheme collapsed. The Greenwoods suffered damages as a result of Berkshire Bank's misconduct.

25.    Plaintiffs Darlene and Wayne Stetson (the "**Stetsons**") are citizens of the State of New York. The Stetsons entered into three separate loan transactions with Marshall. Specifically, the Stetsons made a first loan in the amount of $5,000 to Marshall on August 31, 2018, a second loan in the amount of $3,500 to Marshall on August 31, 2018, and a third loan in the amount of $120.00 to Marshall on November 14, 2022. In exchange therefor, Marshall executed unsecured 30-day demand notes bearing interest at the rate of 8% per annum in their favor (Note #s 4522, 4523 and 5036). Each month the Stetsons would roll their interest into a new note, and Marshall would execute an addendum acknowledging the new face amount. Throughout the course of their relationship with Marshall, the Stetsons also regularly made additional principal investments with Marshall, which was then added to their outstanding loan balances. The Stetsons lost most or all of their investments, including but not limited to approximately $70,000 in principal contributions, when the scheme collapsed. The Stetsons suffered damages as a result of Berkshire Bank's misconduct.

26.    Berkshire Bank is a citizen of the State of Massachusetts. Specifically, Berkshire is a Massachusetts trust company (formerly a Massachusetts banking corporation) having its corporate headquarters at 24 North Street, Pittsfield, Massachusetts, and its principal office for the transaction of business in the State of New York at 30 South Pearl Street, Albany, New York. Berkshire Bank has 86 domestic locations across five states and provides Commercial Banking, Retail Banking, Consumer Lending, Private Banking and Wealth Management services. Berkshire Bank is regulated by the Federal Deposit Insurance Corporation. At year-end 2024, Berkshire Bank had total assets of approximately $12.2 billion and total deposits of approximately $10.5 billion. According to the SEC

8

Form 10-K filed by Berkshire Bank's parent company, (Berkshire Hills Bancorp, Inc.) on March 3, 2025, Berkshire Bank reported operating revenue of approximately $433.7 million, operating income of approximately $95 million, and net income of approximately $61 million as of December 31, 2024.

### C.    JURISDICTION AND VENUE

27.    This Court has subject matter jurisdiction of the action between the Noteholder Investors and Berkshire Bank under the Class Action Fairness Act of 2005 ("**CAFA**"), codified at 28 U.S.C. § 1332(d)(2). At least one member of the Class is a citizen of a different state than Defendant, there are more than one hundred members of the Class, and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00).

28.    This Court has subject matter jurisdiction of the action between Stevens and Berkshire Bank pursuant to 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

29.    Venue is proper in the Northern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

### D.    BANKRUPTCY PROCEEDINGS

30.    On March 28, 2023, the New York State Attorney General's Office issued a press release stating that it was investigating "irregularities" in Marshall's "8 Percent Promissory Note Fund."

31.    Less than a month later, on April 20, 2023 (the "**Petition Date**"), Marshall filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Northern District of New York (the "**Bankruptcy Court**") and the proceeding was assigned Case Number 23-60263-PGR (the "**Bankruptcy Case**").

32.     General information regarding Marshall's businesses and the events which purportedly lead up to the Petition Date can be found in the *Declaration of M. Burton Marshall Pursuant to Local Bankruptcy Rule 2015-2* filed in the Bankruptcy Case at Docket Number 7.[4]

33.     On April 20, 2023, Marshall filed schedules of assets and liabilities (collectively, the "**Schedules**") and a statement of financial affairs [Docket No. 3].  On the Petition Date, Marshall had approximately $22 million in assets according to his sworn Schedules, with approximately $95 million in liabilities owed to approximately 985 noteholder investors.

34.     From April 20, 2023 to September 21, 2023, Marshall continued to operate his sole proprietorships and manage his properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

35.     On May 9, 2023, the Office of the United States Trustee for the Northern District of New York (the "**US Trustee**"), pursuant to section 1102 of the Bankruptcy Code, appointed an Official Committee of Unsecured Creditors (the "**Committee**") [Docket No. 52].

36.     On June 27, 2023, the US Trustee filed a motion seeking appointment of a chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code or, in the alternative, appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code (the "**Motion to Appoint Trustee**") [Docket No. 106].

37.     On September 20, 2023, the Bankruptcy Court granted the Motion to Appoint Trustee and entered a *Memorandum-Decision and Order Granting Motion to Appoint a Trustee* [Docket No. 221].

38.     On September 21, 2023, the US Trustee filed an application requesting the entry of an order approving the appointment of Stevens as Chapter 11 Trustee [Docket No. 224] and later that

---

[4] All references to "Docket No." shall be to the docket in the Bankruptcy Case.

176644894.1

day, the Bankruptcy Court approved the appointment of Stevens as Chapter 11 Trustee and entered an *Order Approving the United States Trustee's Appointment of Chapter 11 Trustee* [Docket No. 225].

39.    On September 26, 2023 (the "**Marshall Inc. Petition Date**"), the Chapter 11 Trustee filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code for Miles B. Marshall Inc. with the Bankruptcy Court (the "**Marshall Inc. Bankruptcy Case**").

40.    On November 8, 2023, the Bankruptcy Court entered an order directing joint administration of the Marshall Bankruptcy Case and the Marshall Inc. Bankruptcy Case [Docket No. 281].

41.    On February 20, 2024, the Chapter 11 Trustee filed a *Joint Plan Of Liquidation Pursuant To Chapter 11 Of The Bankruptcy Code* (the "**Chapter 11 Plan**") and *Disclosure Statement For Joint Plan Of Liquidation Pursuant To Chapter 11 Of The Bankruptcy Code* (the "**Disclosure Statement**") [Docket Nos. 317-318].    Among other things, the Chapter 11 Plan and Disclosure Statement provided for the appointment of a Plan Administrator, set forth the Plan Administrator's powers and duties, and provided a procedure for Holders of Allowed Class 4 Claims to assign their Bank Litigation Claims (as defined in the Chapter 11 Plan) to the Plan Administrator to investigate, and if deemed appropriate, prosecute for their collective benefit ("**Assignment(s)**").    *See, e.g.*, Chapter 11 Plan at §§ 1.8, 1.9, 4.4, 5.3, and 5.4(a)(vi).

42.    On April 10, 2024, the Bankruptcy Court entered an *Order Approving (I) Disclosure Statement, (II) Form And Manner Of Notices, (III) Form Of Ballot And (IV) Solicitation Materials And Solicitation Procedures* (the "**Solicitation Procedures Order**").    [Docket No. 356].

43.    Pursuant to the Solicitation Procedures Order, (as evidenced by the Solicitation Affidavit [Docket No. 363]), on April 16, 2024, the Plan Proponents commenced their solicitation of votes on the Chapter 11 Plan by mailing to the members of Class 4 a package containing, among other things, the Assignment form, substantially in the form approved by the Solicitation Procedures Order.

44.     On May 21, 2024, the Bankruptcy Court so ordered a Consent Stipulation granting Marshall's voluntary waiver of discharge pursuant to Bankruptcy Code sections 727(a)(10) and 1141(d)(4) (the "**Waiver of Discharge**") [Docket No. 382].  Among other things, the Waiver of Discharge states that "[t]he Trustee has indicated, and the Debtor disputes, that the denial of the Debtor's discharge may be appropriate under sections 727(a)(3), and/or (a)(5), because, among other reasons, the inability to explain why, according to the Debtor's own schedules, the Debtor's liabilities surpass the fair market value of his assets by approximately $70 million."

45.     On May 24, 2024, the Chapter 11 Trustee filed a *Supplement To The Joint Plan Of Liquidation Pursuant To Chapter 11 Of The Bankruptcy Code* stating that the Trustee would transition to the role of Plan Administrator, identifying the Oversight Committee members, and attaching the Plan Administrator Agreement.  [Docket No. 385].

46.     On July 22, 2024, the Bankruptcy Court entered its *Findings of Fact, Conclusions of Law, and Order Pursuant to 11 U.S.C. § 1129 and Fed. R. Bankr. P. 3020 Confirming Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Confirmation Order**").  [Docket No. 436].

47.     On August 30, 2024, the Chapter 11 Plan became effective in accordance with its terms.

48.     On June 9, 2025, New York State Attorney General Letitia James announced that Marshall had been arrested for operating a "massive Ponzi scheme," resulting in a 49-count indictment charging Marshall with multiple counts of grand larceny, securities fraud, and a scheme to defraud.

**E.     GENERAL ALLEGATIONS**

**I.     Berkshire Bank's Know Your Customer Duties under Federal law**

49.     Congress established the Federal Financial Institutions Examination Council ("**FFEIC**") in 1979.  FFEIC is an interagency body comprised of the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the National Credit Union Administration, the Office of the Comptroller of the Currency, and the Consumer Financial Protection

Bureau.  FFEIC prescribes uniform principals, standards, and report forms for the federal examination of financial institutions and makes recommendations to promote uniformity in the supervision of financial institutions.[5]

50.     The FFEIC Bank Secrecy Act (BSA)/Anti-Money Laundering (AML) Examination Manual provides guidance to examiners for carrying out Bank Secrecy Act/Anti-Money Laundering ("**BSA/AML**") and Office of Foreign Assets Control ("**OFAC**") examinations. An effective BSA/AML compliance program requires sound risk management; therefore, the manual also provides guidance on identifying and controlling risks associated with money laundering and terrorist financing. The manual contains an overview of BSA/AML compliance program requirements, BSA/AML risks and risk management expectations, industry sound practices, and examination procedures. The development of the manual was a collaborative effort of the federal and state banking agencies and the Financial Crimes Enforcement Network ("**FinCEN**"), a bureau of the U.S. Department of the Treasury, to ensure consistency in the application of the BSA/AML requirements.[6]

51.     The BSA was designed to help identify the source, volume, and movement of currency and other monetary instruments transported or transmitted into or out of the United States or deposited in financial institutions. The statute sought to achieve that objective by requiring individuals, banks, and other financial institutions to file currency reports with the U.S. Department of the Treasury (U.S. Treasury), properly identify persons conducting transactions, and maintain a paper trail by keeping appropriate records of financial transactions. These records enable law enforcement and regulatory agencies to pursue investigations of criminal, tax, and regulatory violations, if warranted, and provide evidence useful in prosecuting money laundering and other financial crimes.[7]

---

[5] *See Mission | FFIEC* (last visited July 23, 2025).

[6] *See 2014 FFIEC Bank Secrecy Act/Anti-Money Laundering Examination Manual* (last visited July 23, 2025).

[7] *Id*.

176644894.1

52.     The federal banking agencies require each bank under their supervision to establish and maintain a BSA compliance program.[8]

53.     In accordance with the USA PATRIOT Act, FinCEN's regulations require certain financial institutions to establish an AML compliance program that guards against money laundering and terrorist financing and ensures compliance with the BSA and its implementing regulations.[9]

54.     As part of a strong BSA/AML compliance program, the federal banking agencies seek to ensure that a bank has policies, procedures, and processes to identify and report suspicious transactions to law enforcement.[10]

55.     Banks must be able to identify and take appropriate action once put on notice of any of a series of anomalies in account behavior or "red flags" that could indicate unusual or suspicious activity.

56.     FFIEC has identified an extensive list of BSA and AML red flags.[11]

---

[8] *Id*.

[9] *Id*.

[10] *Id*.

[11] The FFEIC examples of potentially suspicious activities, or "red flags", include (but are not limited to):

1. Customer uses a personal account for business purposes.
2. Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank.
3. The customer's background differs from that which would be expected on the basis of his or her business activities.
4. Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts.
5. Funds transfer activity is unexplained, repetitive, or shows unusual patterns.
6. Payments or receipts with no apparent links to legitimate contracts, goods, or services are received.
7. Funds transfers are sent or received from the same person to or from different accounts.
8. Unusually high level of transactions initiated over the Internet or by telephone.
9. The currency transaction patterns of a business show a sudden change inconsistent with normal activities.
10. A large volume of cashier's checks, money orders, or funds transfers is deposited into, or purchased through, an account when the nature of the accountholder's business would not appear to justify such activity.
11. A retail business has dramatically different patterns of currency deposits from similar businesses in the same general location.
12. Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals.
13. Goods or services purchased by the business do not match the customer's stated line of business.
14. Payments for goods or services are made by checks, money orders, or bank drafts not drawn from the account of the entity that made the purchase.
15. Loans are made for, or are paid on behalf of, a third party with no reasonable explanation.

176644894.1

57.    Berkshire Bank was required to, and did in fact, establish and maintain a BSA/AML compliance program at all relevant times.

58.    In order to fulfill its obligations, Berkshire Bank utilized sophisticated account activity monitoring systems to identify banking transactions or patterns that reflect anomalies or raise "red flags" indicative of potentially improper or illegal activity.

59.    A core aspect of Berkshire Bank's anti-money laundering compliance, as required by federal law, is KYC (or Know Your Customer).

60.    KYC refers to the process Berkshire Bank (and other financial institutions) follows to verify the identity of its customers, assess their risk profile, and monitor their transactions upon account opening and throughout the banking relationship.

61.    KYC is a vital tool for detecting and preventing illicit activities such as financial crimes, money laundering, and other illegal activities.

62.    The four primary objectives of KYC are: 1) customer identification; 2) risk management; 3) regulatory compliance; and 4) trust building to prevent financial crimes and ensure the economic system's integrity.

---

16.  Loans that lack a legitimate business purpose.
17.  The size and frequency of currency deposits increases rapidly with no corresponding increase in noncurrency deposits.
18.  Payments to or form the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number.
19.  Transacting businesses share the same address, provide only a registered agent's address, or have other address inconsistencies.
20.  Unusually large number and variety of beneficiaries are receiving funds transfers from one company.
21.  Deposits are structured through multiple branches of the same bank or by groups of people who enter a single branch at the same time.
22.  Currency is deposited or withdrawn in amounts just below identification or reporting threshhholds.
23.  Customer repeatedly uses a bank or branch location that is geographically distant from the customer's home or office without sufficient business purpose.
24.  Customer makes multiple and frequent currency deposits to various accounts that are purportedly unrelated.
25.  Customer makes high-value transactions not commensurate with the customer's known incomes.

176644894.1

63.     At all relevant times hereto, Berkshire Bank's KYC process consisted of several legally required steps including:

a.     **Customer onboarding**: When a new customer established a relationship with Berkshire Bank, the bank was required to collect and verify the customer's identification and other relevant information.

b.     **Customer Identification Program ("CIP")**: Under the CIP, Berkshire Bank was required to collect basic customer information (such as name, date of birth, address, and identification number).  Berkshire Bank was also required to verify the customer's identity by comparing the provided information with documents (e.g., passports, driver's license, or Social Security card).  With this information, Berkshire Bank would determine whether the customer appeared on any government sanction lists (e.g., watchlists, blacklists, Blocked Persons List, Financial Action Task Force Lists, Transparency Index lists, State Sponsors of Terrorism list, etc.).  Berkshire Bank then runs the information through a reporting agency, checks prior bank references, and obtains (i) a financial statement for the business; (ii) a description of the customer's principal line of business; (iii) a list of major suppliers and customers and their geographic locations; (iv) a description of the business's primary trade area, and whether international transactions are expected to be routine; and (v) a description of the business operations (i.e., retail versus wholesale), and the anticipated volume of cash sales.

c.     **Customer Due Diligence ("CDD")**: Berkshire Bank was required to understand the purpose and nature of the business relationship with its customers.  Among other things, Berkshire Bank had to determine the types of products and services the customer was interested in, the expected transaction volume, and the reasons for

establishing the relationship. The CDD process involved collecting more detailed information about the customer, including their financial history, source of funds, and the intended nature of their business relationship. This process helped Berkshire Bank assess the risk associated with the customer and determine if they were involved in illicit activities.

d.  **Enhanced Due Diligence ("EDD") for High-Risk Customers**: When Berkshire Bank conducted EDD, it was required to perform background checks, conduct additional document verification, and conduct heightened scrutiny of account activity on an on-going basis. This included investigating the reasons for such account activity and, if necessary, filing Suspicious Activity Reports with relevant law enforcement authorities.

e.  **Ongoing Monitoring**: Berkshire Bank was required to scrutinize customer transactions on an on-going basis to detect unusual patterns or activities that may indicate money laundering, terrorist financing, or other financial crimes. Berkshire Bank was required to have systems in place to identify and flag such transactions for further investigation. Berkshire Bank was required to continuously monitor its customers' transactions and activities to ensure they remained compliant with regulations and that their risk profile remained unchanged. This involved reviewing account activity, conducting periodic reviews, and updating customer information. Berkshire Bank was required to be on the lookout for activity that was disproportionate to the customer's known business.

II.  **Berkshire Bank performs KYC on Marshall and classifies him as a High-Risk Business Customer.**

64.  By fulfilling its KYC obligations, Berkshire Bank learned that (i) Marshall was a resident of New York State; (ii) his date of birth is August 23, 1951; (iii) his office was located in a

17

nondescript building located at 11 Maple Avenue, Hamilton, New York; and (iv) he purportedly operated the following unincorporated businesses as sole proprietorships in Hamilton, New York:



(a)     **M&M Press**: Marshall purported to operate a commercial printing shop as a sole proprietorship. The business was focused on large form printing (signage, banners, etc.), letterhead, envelopes, and other custom printing.

(b)     **Marshall Tax Service**: Marshall prepared tax returns for both individuals and businesses through this sole proprietorship. Notably, Marshall is not a licensed Certified Public Accountant, he is an Enrolled Agent.

(c)     **Marshall Moving**: Marshall purported to operate Marshall Moving as a sole proprietorship. This business was a moving service with the primary customers being college students for move-ins and move-outs, as well as tenants renting Marshall properties.

(d)     **Marshall Storage**: Marshall purported to operate three (3) storage facility properties as sole proprietorships. Two of these properties had storage lockers, while the third storage property, referred to as "Big Stuff," was a converted barn, primarily used for storage of items such as cars and boats.

18

(e)    **Marshall Maintenance**: Marshall purported to operate Marshall Maintenance as a sole proprietorship.  This business was a handyman service providing general home maintenance services to its customers.

(f)    **Marshall Rentals**: Marshall individually owned over one hundred rental properties containing over 240 residential units through M. Burton Marshall d/b/a Marshall Rentals.  In addition to single family residences and apartment buildings, Marshall also owned vacant land.

65.    Notably, Hamilton is a small rural community in the southeast corner of Madison County, New York.  As of the 2020 census, the town had a population of 6,379 residents and is home to Colgate University.  Upon information and belief, the 2025 annual budget of Hamilton is approximately \$3.4 million—a fraction of the amounts that flowed through Marshall's individual account (the 2301 Account) at Berkshire Bank on an annual basis.

66.    In addition to the required onboarding and KYC processes that Berkshire Bank undertook, it should be noted that Marshall's small businesses and the relatively light traffic in the Oriskany Falls branch meant that branch employees knew Marshall's employees, not just on a need-to-know KYC level, but on a personal level.  Marshall employed approximately 10 people and only two or three made the daily deposits at Berkshire Bank.  On each of these occasions, there were only three or four tellers at the bank.  The Berkshire Bank tellers and Marshall employees knew each other by name and had conversations while the bank tellers assisted them with their daily transactions, many of which consisted of thousands (if not tens of thousands) of dollars in cash as reflected by the Currency Transaction Reports referenced below.

67.    Upon completing the customer onboarding and KYC process, Berkshire Bank opened the following seven primary accounts for Marshall, one in his individual name (the 2301 Account) and six others for "doing business as" accounts:

| Account Name | Account Number | Type of Account | Opening Date |
|---|---|---|---|
| M. Burton Marshall d/b/a M&M Press | X8128 | Business Checking | February 11, 2015 |
| M. Burton Marshall d/b/a Marshall Tax Service | X0522 | Business Checking | May 13, 2014 |
| M. Burton Marshall d/b/a Marshall Moving | X1246 | Business Checking | February 11, 2015 |
| M. Burton Marshall d/b/a Marshall Maintenance | X8136 | Business Checking | February 11, 2015 |
| M. Burton Marshall d/b/a Marshall Maintenance | X2218 | Business Checking | February 11, 2015 |
| M. Burton Marshall d/b/a Marshall Rentals | X8400 | Business Checking | February 11, 2015 |
| M. Burton Marshall | X2301 | Business NOW checking account | February 11, 2015 |

68.    Based on the information it obtained concerning Marshall's anticipated cash volume, ACH volume, and check volume, Berkshire Bank classified Marshall as a High-Risk Business Customer.

69.    In fact, on July 24, 2015, when Barbara Misiaszek, Berkshire Bank's manager for its Oriskany Falls branch, processed and reviewed Burt Marshall's credit application, which listed the 2301 Account as an overdraft account, Berkshire Bank flagged among other things "Miles Marshall has a fraud victim or miscellaneous security alert in their Business Owner Profile."

70.    As a result of Marshall's High-Risk Business Customer classification, Berkshire Bank conducted Enhanced Due Diligence (EDD) on Marshall, including performing heightened scrutiny of his account activity with the bank's sophisticated account activity monitoring systems (including Verafin, IBS, and Abrigo) throughout the duration of their banking relationship.

176644894.1

71.     For example, Berkshire Bank conducted EDD with respect to Marshall on or about August 2, 2017, where it scrutinized the transaction history for his accounts, cash activity, summary of ATM servicing, reconciliation, among other things.  This EDD occurred in addition to the ongoing BSA Alerts that occurred for years before and after this date.

### III.    Marshall's Fraudulent Investment Scheme

72.     Over the course of several decades, Marshall actively solicited and secured approximately $90 million from approximately 1,000 noteholder investors to whom he promised an 8% return on their money.

73.     The noteholder investors included hard working residents and retirees in Madison County and surrounding states, including individuals associated with volunteer fire departments, churches, community organizations, and even a snowmobile club.

74.     In order to document the purported loans, Marshall executed rudimentary unsecured promissory notes that were payable on demand with 30-days' notice and provided that interest could be paid monthly or reinvested.[12]

75.     Marshall represented to investors that the loan proceeds would be used primarily to purchase property, refurbish rental houses, and pay normal and ordinary expenses of rental property such as repairs, maintenance, utilities, debt service, insurance, real estate taxes, etc., in the Hamilton, New York area.

76.     In truth, Marshall's investment scheme was "Ponzi-like" in the sense that new investor funds were commingled with other funds and used to repay prior investors, thereby providing the illusion of a legitimate and properly functioning investment opportunity. The New York State Attorney General's Office characterized it as a "massive Ponzi scheme."

---

[12] Exemplars of the promissory notes, addenda, Marshall's representations to investors, and transaction summaries were filed in the Bankruptcy Case. *See, e.g.*, Docket Nos. 130 and 132.

77.    On June 12, 2024, the Chapter 11 Trustee filed an *Omnibus Motion For An Order (I) Modifying, Fixing, And Allowing The General, Unsecured Claims Of The Approximately 985 Noteholder Investors In The Marshall "Eight Percent Fund"; (II) Finding That the Debtor Was Operating A Ponzi Scheme Since At Least 2011; And (III) Approving The Trustee's Claim Reconciliation Approach* (Docket No. 404 – the "**Ponzi Motion**").  The Ponzi Motion was supported by Declarations and a detailed analyses performed by two financial advisors.

78.    After an evidentiary hearing, the Bankruptcy Court entered an Order granting the Ponzi Motion on July 22, 2024 (Docket No. 433 - the "**Ponzi Order**").  The Ponzi Order contained the following findings of fact and conclusions of law concerning Marshall's fraudulent investment scheme:

> On the Petition Date, Marshall had at best $22 million in assets and over $95 million in liabilities owed to approximately 985 Noteholders.  The most significant asset of Marshall's estate is his real property, consisting of over 100 rental properties containing over 240 residential units (each a "Property" and collectively, the "Properties").

> Marshall funded the acquisition of the rental Properties and storage centers by personal borrowing pursuant to unsecured, 30-day demand Notes paying interest at 8% per annum.  According to the analysis completed by RK Consultants, LLC ("RKC"), the Trustee's financial advisors, there are approximately 985 Noteholders with approximately 1,200 demand Notes outstanding as of the Petition Date with a collective amount owed by Marshall's bankruptcy estate to noteholders of $94,200,768.61. The Noteholders are largely individuals that were clients of Marshall's tax preparation business, or friends and family of clients.

> Marshall began the practice of borrowing from individuals and acquiring the Properties over 40 years ago. In addition to the Noteholders, Marshall owes another approximately $2.2 million in secured mortgage debt and various other claims.

> According to Marshall himself, the total value of his assets is just $21,854,009.89, or about one-fifth of the amount that he admittedly owes as of the Petition Date. The Trustee's sale and liquidation efforts have demonstrated that the actual saleable value of Marshall's assets is markedly less than the value that Marshall gave in his schedules and is closer to $14,100,000.

> Marshall borrowed using the demand Notes where Noteholders had the right to demand the return of their principal upon a 30-day demand, but invested in an illiquid real estate portfolio. In this way, even if the value of Marshall's assets was on par with the amount of his liabilities, he could never meet a demand for repayment without finding a source of liquidity other than liquidating Properties in the portfolio (i.e., he would have to

176644894.1

borrow from another party in order to meet the liquidity needs of an existing Noteholder).

When Marshall was asked if there was some point in time when he knew he would not be able to repay his debts with the rental properties, he answered simply "I always assume[d] that the appreciation of the real estate would more than help pay for the [debts]. That's obviously false now, but that's what I always thought." See 341 Mtg. 10:7-12, June 26, 2023.

Marshall paid 8% to Noteholders on the Notes. When Marshall started this practice approximately 40 years ago, average 30-year mortgage rates were in excess of 14%, so Marshall's borrowing at 8% looked favorable when compared to the market. See *Id*., ¶ 36. However, over time, market rates changed substantially while the rate of return on the Notes remained static. *See Id*., ¶ 37. By the mid-1990's, the mortgage rates were roughly even with the 8% that Marshall continued to pay Noteholders, and by the early-2000's, mortgage rates were substantially less than 8%. *Id*. At the same time, Marshall continued to borrow on the same exact same terms without any adjustment for market conditions. *Id*. Thus, the Noteholders received substantially larger returns than they could achieve anywhere else in the market and the Noteholders had the ability to demand the return of their investment in just 30 days. When the 8% rate that Marshall paid to creditors is compared to the amount paid on certificates of deposit, the disparity is even greater. *Id*. at ¶ 39. The return on certificates of deposit was well below 1% for the decade between 2010 and 2020.

Thus, at the end, Marshall's real estate portfolio was incurring interest at over twice the rate that it was taking in cash, and sixteen times the rate it was taking in cash net of expenses. *Id*. This was completely unsustainable and became increasingly so over time.

Marshall was a person of some prominence in the community and was in a position of financial intimacy with many of the creditors by virtue of his tax consulting and return preparation business. This presumably provided the access and credibility necessary to sell the Eight Percent Fund to hundreds of people.

Marshall lacked a legitimate business for at least the last decade. The purpose of initial investments in the Eight Percent Fund was to acquire pieces of real estate to rent. However, on and after 2011 when Marshall's debt was increasing exponentially as set forth above, Marshall only acquired approximately 16 parcels of real property with a collective estimated current fair market value of $2,748,138. *Id*. at ¶ 48. Thus, while it does not appear that the Eight Percent Fund started as a fraud utterly lacking in a legitimate business purpose, it ultimately became that.

Finally, and most significantly, since at least 2011, Marshall was using new investment funds to pay off previous investors in order to forestall disclosure of the fraud, which is the true indicia of a Ponzi scheme. Indeed, it took a major health emergency that took Marshall away from the office for months for the Eight Percent Fund to be discovered as a Ponzi scheme and to ultimately collapse.

From 2011 to 2023, Marshall's indebtedness was always significantly more than his asset value and grew from $35.6 million to a staggering $94.2 million during that time. At the same time, Marshall only acquired an additional approximately $2.8 million worth of assets. Also, during that period, Marshall originated 1,587 new notes and closed 1,181 and was thereby acquiring new investment funds for the exclusive purpose of paying off previous investors all while insolvent and not partaking in any serious asset acquisition activities.

Marshall also admitted to the obvious – that he would, at least at times, borrow in order to repay investors.

**Based upon the foregoing, the Court finds and concludes that Marshall was operating a Ponzi scheme via the Eight Percent Fund at least since 2011.**[13]

79.     Hundreds of noteholder investors lost the majority of their investment, which in many instances was their life savings. These investors are now struggling to find the means to sustain their livelihood as a result of Marshall's fraudulent investment scheme.

80.     Adding insult to injury, Marshall issued IRS Form 1099-INT to investors who chose to reinvest their interest payments on an annual basis and thereby triggered a taxable event for such investors on interest payments they did not (nor ever will) receive.

### IV.     Berkshire Bank gains knowledge of Marshall's fraudulent investment scheme and renders substantial assistance thereto.

81.     Although Berkshire Bank required Marshall to open separate accounts for each "doing business as" account, it allowed him to continually sweep the funds from those accounts to the account maintained in his individual name (the 2301 Account) without restriction. As a result, Berkshire Bank had actual knowledge that Marshall was commingling personal, business, and investment funds from 2015 through 2023.

82.     During this same time frame, Berkshire Bank also knew that Marshall was actively soliciting investments from third parties, was depositing the investment funds totaling tens of millions

---

[13] Ponzi Order at ¶¶ 14, 16-19, 25, 27-30, 37-39, and 41-43.

of dollars into his accounts at the bank (often in large cash deposits that triggered alerts), and simultaneously disbursing payments to investors totaling tens of millions of dollars from his accounts at the bank.

83.    As the following charts depict, Marshall's legitimate business revenue only represented 28% of the deposits into his Berkshire Bank accounts, and his legitimate business expenses only represented approximately 16% of the disbursements from his Berkshire Bank accounts:

| Marshall Revenue as % of Inflows | | | |
|---|---|---|---|
| Year | Bank Inflows (per bank statements) ($) | Marshall Revenue (per tax returns) ($) | Revenue as % of Inflows |
| 2022 | 14,324,126 | 3,826,462 | 27% |
| 2021 | 13,842,277 | 3,729,393 | 27% |
| 2020 | 13,835,432 | 3,336,839 | 24% |
| 2019 | 12,549,860 | 3,376,515 | 27% |
| 2018 | 12,028,405 | 3,207,016 | 27% |
| 2017 | 12,859,983 | 3,107,838 | 24% |
| 2016 | 13,055,244 | 2,914,367 | 22% |
| 2015 | 9,289,066 | 2,812,257 | 30% |

| Marshall Expenses as % of Outflows | | | |
|---|---|---|---|
| Year | Bank Outflows (per bank statements) ($) | Marshall Expenses (per tax returns) ($) | Expenses as % of Outflows |
| 2022 | 14,671,904 | 2,292,060 | 16% |
| 2021 | 13,135,529 | 2,097,931 | 16% |
| 2020 | 13,818,759 | 1,912,750 | 14% |
| 2019 | 12,547,969 | 1,931,824 | 15% |
| 2018 | 12,616,889 | 1,982,493 | 16% |
| 2017 | 12,930,608 | 2,024,584 | 16% |
| 2016 | 12,321,851 | 1,899,127 | 15% |
| 2015 | 8,839,422 | 2,031,065 | 21% |

84.    From 2015 through 2023, numerous transactions in Marshall's Berkshire Bank accounts, particularly the 2301 Account, were transparent to Berkshire Bank as bearing obvious hallmarks of an on-going Ponzi scheme: i.e., using deposits from new investors to pay earlier investors and Marshall's personal and business expenses. Each and every one of the 49 counts in the Indictment charge Marshall with crimes that occurred while Marshall banked exclusively with Berkshire Bank.

85.    Transaction activity in the Marshall accounts triggered 44 BSA alerts and 42 other alerts by Berkshire Bank's sophisticated account activity monitoring systems from 2017 through 2021 and from 2020 through 2023, respectively.  The BSA alerts disclosed irregular and/or suspicious (i) Structured Transactions; (ii) Loan Payments or Disbursements in Cash; (iii) Rolling Monthly Incoming Cash; (iv) Wire Spikes Incoming; and the other alerts disclosed irregular and/or suspicious: (i) Structuring; (ii) Check Fraud; (iii) Deposit Fraud; (iv) Cash In – Transfer Out; and (v) Transfer In – Cash Out.

86.    Notably, the BSA alerts confirm Berkshire Bank's knowledge that Marshall was both actively soliciting unregistered investments, and funneling the investment funds through his commingled Berkshire Bank accounts.  For instance, the BSA alerts state as follows:

(i)    <u>February 24, 2018</u>: "some of his investors had cash they wished to invest with Marshall.  He gains investors by word of mouth from the people he has been working with for years.";

(ii)    <u>March 24, 2018</u>: "cash deposits are most likely rental payments as well as investment money, as *he is well-known for accepting cash investments*.";

(iii)    <u>April 21, 2018</u>: "cash deposits are most likely rental payments as well as investment money, as *he is well-known for accepting cash investments*.";

(iv)    <u>May 19, 2018</u>: "cash deposits are most likely rental payments as well as investment money, as *he is well-known for accepting cash investments.*";

(v)    <u>October 6, 2018</u>: "after getting in touch with Burton Marshall *it was noted in BSA*: 'when buying properties Marshall prefers to work with individuals who loan him the money for the purchase or the improvements. *This gives him more flexibility than working with the banks*.[14]  He has been working with these individuals for years. *You will see large checks (sic) deposits which represent the funds being lent to Marshall.  You will also see checks he pays out marked loan note disbursement which are the returns with interest.*'  This explanation clarifies the source of the funds….";

---

[14] Berkshire Bank apparently agreed that it was easier for Marshall to obtain tens of millions of dollars in loans from unsophisticated individuals and non-profits in Madison County than it was for him to obtain loans from the Bank. Knowing what the Bank knew about Marshall, it surely would not have been as "flexible" as these unsophisticated individuals and non-profits with regard to underwriting, approving, and collateralizing loans for an insolvent borrower. Berkshire Bank would have protected itself from this credit risk but apparently was not concerned with protecting innocent investors.

(vi)    <u>January 26, 2019</u>: "According to a previous alert, when buying properties or making improvements on a property, Burton Marshall acquires loans from individuals";

(vii)    <u>April 20, 2019</u>: "All other account activity supports an IORTA VT account[15] or escrow account for this business/business owner.";

(viii)    <u>July 22, 2019</u>: "During the month of June 2019, account 692301 had an incoming wire spike of 200% when compared to the last 3 months of activity; and

(ix)    <u>July 11, 2020</u>: "***We were concerned about the activity in account 692301*** and reached out to Barb Misiaszek to contact Marshall to gain an understanding of the activity.  When buying properties Marshall prefers to work with individuals who loan him the money for the purchase or the improvements.  *This gives him more flexibility than working with the banks*.  He has been working with these individuals for years.  ***You will see large check deposits which represent the funds being lent to Marshall.  You will also see checks he pays out marked loan note disbursement which are the returns with interest.***"

87.    As reflected above, Berkshire Bank knew on October 6, 2018 (at the latest) that the primary source of deposits in Marshall's accounts was third party investments and the primary source of disbursements was third party investment returns.  Indeed, Berkshire Bank acknowledged the transaction activity reflected "large checks deposits which represent the funds being lent to Marshall [and] checks he pays out marked loan note disbursement which are the returns with interest."

---

[15] An IORTA VT account is a Dividends on Realtors Trust Accounts, a dividend bearing account for client deposits and down payments on real property purchases.  Notably, Marshall was not a licensed real estate agent or broker and none of his Berkshire Bank accounts were established as an IORTA VT account.

88.     Berkshire Bank also received and possessed a number of the investor notes serving as the basis for the tens of millions of dollars in deposits and disbursements flowing into and out of the Marshall accounts from 2015 through 2023.

89.     For instance, Berkshire Bank was informed of and provided with an investor note (Joseph and Renee Hadder Note Nos. 3467 and 3971) on October 14, 2021 having a current balance of $797,159.44.   In connection therewith, a Marshall representative stated: "Before I have Mr. Marshall sign this letter, can you tell me if the contents will work for the bank?".  The Berkshire Bank representative responded as follows: "I think it looks OK".  The communications also referenced monthly interest payments being made and a 30-day redemption/repayment right.

90.     On June 10, 2022, a Marshall representative also exchanged emails with a Berkshire Bank representative bearing the subject line "Kelby Hilts note" and stating  "attached to this email is the information and photocopies on the Promissory Note Burt Marshall signed with Kelby Hilts.  Let me know if you have any questions or need any additional information."  The attachment to this email exchange was a Marshall Letter dated June 7, 2022 stating "Dear Lender: Kelby S Hilts has lent me money.  I issued a Promissory Note as an agreement to pay the money back.  These funds are available to Mr. Hilts at any time, subject to thirty-day notice."   The subject promissory note dated March 27, 2015 and Transaction Summary were also attached to the email exchange and letter.

91.     On October 18, 2021, the Senior AML/Fraud Investigator with NBT Bank sent an email to Berkshire Bank's AVP, Security & Fraud Investigations bearing the subject line "M Burton Marshall" and stating as follows:

Hi Jeanne,

> I just wanted to pass this along as we have seen some activity from this individual who we believe **_may be running a Ponzi scheme_**.  He appears to have an account with Berkshire Bank as well as a number of other financial institutions.  **_We see a lot of money coming from him to individuals for "interest payments" etc._**  He bills himself as some sort of financial advisor for individuals around the North Country.  If you want to give me a call I could provide more details to you.  I don't want to share too much

in email as I know your system and mine don't play nice when I try to send you encrypted emails.

92.     Like the notations on the bank records that caused NBT Bank to conclude Marshall "may be running a Ponzi scheme," there were 22,392 similar notations on Marshall's bank records (*e.g.*, images of Marshall's checks) at Berkshire Bank (totaling $56.3 million dollars in investment funds) as depicted in the following chart:[16]

| | Memo Identifier | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Distribution | Note | Interest/Int | Monthly Payment/ Pymt/Pmt | Balance in Full | Four Digit Account Number | Total | |
| Year | Count | Count | Count | Count | Count | Count | Count | $ |
| 2015 | 997 | 683 | 554 | 123 | 21 | 2 | 2,380 | $ 5,326,584 |
| 2016 | 1,245 | 991 | 326 | 68 | 2 | 12 | 2,644 | 6,843,394 |
| 2017 | 1,382 | 1,102 | 198 | 12 | 3 | - | 2,697 | 7,128,247 |
| 2018 | 1,414 | 1,032 | 246 | 13 | 1 | - | 2,706 | 6,186,727 |
| 2019 | 1,452 | 1,051 | 236 | 12 | - | - | 2,751 | 6,935,576 |
| 2020 | 1,340 | 1,107 | 175 | 5 | - | - | 2,627 | 8,144,211 |
| 2021 | 1,156 | 1,145 | 146 | 3 | - | - | 2,450 | 6,757,802 |
| 2022 | 1,230 | 1,299 | 90 | 9 | - | - | 2,628 | 7,718,670 |
| 2023 | 136 | 1,356 | 14 | 3 | - | - | 1,509 | 1,311,889 |
| Total | 10,352 | 9,766 | 1,985 | 248 | 27 | 14 | 22,392 | $56,353,101 |

93.     Additionally, Berkshire Bank's wire transfer records for the M. Burton Marshall d/b/a Marshall Tax Service account contain transaction entries with the following notations during the period April 20, 2017 through April 20, 2023:

(i)     July 6, 2017: $50,000 "funds purpose is for investment";

(ii)    January 3, 2018: $50,000 "8% Fund";

(iii)   August 12, 2019: $8,000 "investing in real estate";

---

[16] The notations stated, among other things, (i) Distribution: "Distribution from Note", "Note Distribution," "Note #2852 Distribution," and "Distribution 3903"; (ii) Note: "Note #3652 Monthly Pymt," "Note #3148 Quarterly Interest," "Note #3508 Monthly Interest," and "Payment in full Note #3921"; (iii) Interest/Int: "Monthly Interest Pymt 4467," "Quarterly Interest Pymt," and "Annual Interest Pymt 3852"; (iv) Monthly Payment/Pymt/Pmt: "Monthly Pymt 3925," "Monthly Pymt 4216," and "Monthly Pymt 4730"; (v) Balance in Full: "Balance in Full 3674," "Balance in Full for #3796," and "Balance in Full 4177"; and (vi) Four Digit Account Number: "3433," "3440," and "Acct 3938".

(iv)    <u>December 6, 2019</u>: $5,000 "Brian Martin Note";

(v)    <u>January 22, 2020</u>: $210,000 "for account of Grant G Hansel";

(vi)    <u>February 10, 2021</u>: $25,000 "investments";

(vii)    <u>November 30, 2021</u>: $75,000 "for deposit in 8PA Interest Account";

(viii)    <u>February 16, 2022</u>: $250,000 "8% Funds";

(ix)    <u>February 24, 2022</u>: $5,000 "Marla Funds Transfer 1"; and

(x)    <u>March 2, 2022</u>: $6,000 "Marla Loan".

94.    Remarkably, Berkshire Bank received the Hadder promissory notes and NBT Bank email during the same month it was closing the primary branch where Marshall banked, the Oriskany Falls branch. Despite its actual knowledge of Marshall's Ponzi scheme, Berkshire Bank made the conscious decision to continue rendering substantial assistance beyond October 2021 by tasking a private banker/MyBankers with the responsibility of retaining Marshall as a customer and by incentivizing Marshall to do so by providing a scanner that enabled him to remotely deposit up to $300,000 in checks ***per day***.

95.    Throughout the course of their relationship, Berkshire Bank possessed actual first-hand knowledge of Marshall's inability to pay earlier investors or his personal and business expenses without deposits of new investor money – the very hallmarks of an on-going Ponzi scheme. For example,

a)    On August 11, 2016, Marshall deposited $133,731 into his 2301 Account ($120,000 of which consisted of investment funds from Note Nos. 3983, 4017, and 4223-4225), thereby bringing his account balance to $353,215. On August 15, 2016, Marshall used $120,000 of the foregoing investment funds and other funds to repay Note No. 3929 in the amount of $280,896. Marshall would have been unable to repay Note No. 3929

without the earlier deposits of investment funds on Note Nos. 3983, 4017, and 4223-4225;

b)   On August 21 and 23, 2017, Marshall repaid $65,319 on Note No. 3439 and $100,669 on Note No. 4100 from the 2301 Account with funds deposited by other investors on August 16, 2017 ($63,356 related to Note No. 4182), August 18, 2017 ($50,000 related to Note No. 2642 and $20,000 related to Note No. 3788), and August 21, 2017 ($60,000 related to Note No. 4382).  Marshall would have been unable to repay Note Nos. 3439 and 4100 without the earlier deposits of investment funds on Note Nos. 4182, 2642, 3788, and 4382;

c)   On June 14, 2019, Berkshire Bank's records reflected Marshall's deposit of Hadder investment funds totaling approximately $201,435.00 and subsequent use of those funds to pay several other investors and a host of personal and business expenses. Marshall would have been unable to pay the other investors and his personal and business expenses without the earlier deposit of Hadder investment funds;

d)   In the period August 13 through 15, 2019, Marshall deposited $175,508 into his 2301 Account, thereby bringing his account balance to $286,036 on August 15, 2019.  These deposits consisted of (i) a $49,565 deposit on August 13, 2019 (of which $40,000 related to Note No. 2642 and $8,000 related to Note No. 4138); (ii) a $72,715 deposit on August 14, 2019 (of which $50,000 related to Note No. 4627 and $10,000 related to Note No. 1896); and (iii) a $53,227 deposit on August 15, 2019 (of which $50,000 related to Note No. 3361).  On August 23, 2019, Marshall used the foregoing deposits to repay Note No. 4158 in the amount of $142,665. Marshall would have been unable to repay Note No. 4158 without the earlier deposits of investment funds on Note Nos. 2642, 4138, 4627, 1896, and 3361; and

e)   In the period May 7, 2020 through May 13, 2020, Marshall deposited $217,000 into his 2301 Account, thereby bringing his account balance to $719,015 on May 13, 2020. These deposits consisted of (i) a $167,000 deposit of the proceeds of a PPP loan on May 7, 2020 and (ii) a $50,000 deposit related to investor Note No. 3249 on May 13, 2020.   On May 14, 2020, Marshall withdrew $151,426 to repay Note No. 4337, $151,642 to repay Note No. 4336, and $221,603 to repay Note No. 4122.  Marshall would have been unable to repay Note Nos. 4337, 4336, and 4122 without the earlier deposits of the proceeds of the PPP loan and investment funds on Note No. 3249.

96.    Berkshire Bank was also required to file Currency Transaction Reports (or CTRs) with the Financial Crimes Enforcement Network (FinCEN) for each cash deposit, withdrawal, exchange of currency, or other payment or transfer, by, through, or to the financial institution which involved a transaction in currency valued at more than $10,000 for the purpose of detecting money laundering, tax evasion, and other illegal activities.

97.    The instructions to FinCEN Form 104 (the CTR form) state as follows: "If a transaction is suspicious and in excess of $10,000 in currency, then both a CTR and the appropriate Suspicious Activity Report form must be filed. In situations involving suspicious transactions requiring immediate attention, such as when a reportable transaction is ongoing, the financial institution shall immediately notify, by telephone, appropriate law enforcement and regulatory authorities in addition to filing a timely suspicious activity report."[17]

98.    In the period 2021 through 2023, Berkshire Bank filed the following 41 CTRs for suspicious cash deposits exceeding $10,000 per occasion into the Marshall accounts:

| DATE | CTR NUMBER | BRANCH | CASH DEPOSIT |
|---|---|---|---|
| April 27, 2021 | 246499867 | Oriskany Falls | $12,560.00 |

---

[17] Upon information and belief, however, Berkshire Bank failed to file a suspicious activity report (SAR) or notify law enforcement authorities about Marshall's suspicious transactions before *July 2, 2024.*

| April 27, 2021 | 252278900 | Oriskany Falls | $10,380.00 |
| May 6, 2021 | 259385323 | Oriskany Falls | $10,200.00 |
| June 2, 2021 | 276789579 | Oriskany Falls | $13,283.00 |
| June 3, 2021 | 280407102 | Oriskany Falls | $14,910.00 |
| June 5, 2021 | 278788107 | Oriskany Falls | $10,080.00 |
| June 17, 2021 | 286836226 | Oriskany Falls | $49,830.00 |
| June 17, 2021 | 289482674 | Oriskany Falls | $10,820.00 |
| July 21, 2021 | 311735353 | Oriskany Falls | $16,080.00 |
| August 5, 2021 | 321704162 | Oriskany Falls | $18,830.00 |
| September 14, 2021 | 352724878 | Oriskany Falls | $15,560.00 |
| November 10, 2021 | 395011899 | Pittsfield, MA | $45,563.00 |
| December 7, 2021 | 416425547 | Seneca Turnpike/New Hartford | $42,070.00 |
| December 31, 2021 | 429489908 | Seneca Turnpike/New Hartford | $10,030.00 |
| January 7, 2022 | 437887347 | Seneca Turnpike/New Hartford | $12,471.00 |
| February 2, 2022 | 455454260 | West Winfield, NY | $11,990.00 |
| February 11, 2022 | 461074249 | Seneca Turnpike/New Hartford | $11,870.00 |
| March 5, 2022 | 478276429 | West Winfield, NY | $10,930.00 |
| March 17, 2022 | 486392026 | Seneca Turnpike/New Hartford | $21,330.00 |
| March 25, 2022 | 492263306 | Seneca Turnpike/New Hartford | $22,720.00 |
| April 7, 2022 | 501547386 | Seneca Turnpike/New Hartford | $63,130.00 |
| April 15, 2022 | 506448088 | Seneca Turnpike/New Hartford | $10,572.00 |

176644894.1

| April 21, 2022 | 511701312 | Seneca Turnpike/New Hartford | $11,670.00 |
| June 3, 2022 | 543901143 | East Syracuse, NY | $33,240.00 |
| June 9, 2022 | 548362329 | East Syracuse, NY | $36,652.00 |
| July 6, 2022 | 564474974 | Seneca Turnpike/New Hartford | $26,708.00 |
| July 22, 2022 | 579825042 | Seneca Turnpike/New Hartford | $15,344.00 |
| July 28, 2022 | 583544196 | East Syracuse, NY | $20,480.00 |
| September 20, 2022 | 621750519 | Seneca Turnpike/New Hartford | $19,310.00 |
| September 21, 2022 | 623383569 | Seneca Turnpike/New Hartford | $58,830.00 |
| November 18, 2022 | 666288682 | Seneca Turnpike/New Hartford | $17,130.00 |
| December 6, 2022 | 677721611 | Seneca Turnpike/New Hartford | $13,352.00 |
| December 13, 2022 | 682217980 | Seneca Turnpike/New Hartford | $41,250.00 |
| December 15, 2022 | 685089798 | Seneca Turnpike/New Hartford | $11,623.00 |
| January 31, 2023 | 717471413 | Seneca Turnpike/New Hartford | $25,300.00 |
| February 8, 2023 | 723246377 | Seneca Turnpike/New Hartford | $14,360.00 |
| February 14, 2023 | 728060139 | Seneca Turnpike/New Hartford | $14,564.00 |

| February 22, 2023 | 733225625 | Seneca Turnpike/New Hartford | $14,940.00 |
| February 28, 2023 | 737478205 | Seneca Turnpike/New Hartford | $10,790.00 |
| March 9, 2023 | 743592808 | Seneca Turnpike/New Hartford | $10,588.00 |
| March 16, 2023 | 748012909 | Seneca Turnpike/New Hartford | $11,651.00 |

99.    As a result of the foregoing, Berkshire Bank had actual knowledge of each of the following: (1) Marshall maintained 7 checking accounts, one in his own name and six in his name and the name of a "doing business as"; (2) Marshall's 2301 Account had inflows and outflows totaling on average more than $25 million per year while the other six accounts' inflows and outflows were nominal by comparison; (3) Marshall was depositing and disbursing significant investment funds despite not being a financial advisor, broker, or in any business with a stated purpose of soliciting investments; (4) Marshall was dependent on deposits of new investment funds in order to repay earlier investors and his personal and business expenses; (5) Marshall's businesses were located in or around Hamilton, New York, a small town in a rural community with an annual budget of approximately $3.5 million, or 1/8 the total money flowing through Marshall's accounts at Berkshire Bank; (6) Marshall's banking activities triggered repeated Bank Secrecy Act/Anti-Money Laundering alerts; and (7) Marshall's previous bank, and one of the few other banks with a branch in Hamilton, New York, had concluded he may be running a Ponzi scheme based on the same activity that was readily apparent in Marshall's Berkshire Bank accounts.

100.    Instead of closing Marshall's accounts or reporting him to law enforcement authorities as required by federal law and its policies and procedures, Berkshire Bank repeatedly chose to bury its head in the sand because it did not want to lose Marshall's business. Over a several year period,

Berkshire Bank allowed Marshall to carry out with impunity the conduct that led to the New York State Attorney General's 49-count Indictment.

101.    To paper over its misdeeds, Berkshire Bank conducted a superficial, perfunctory investigation of Marshall's account activities in response to the NBT Bank email.  Specifically, Berkshire Bank opened a Full Case Report bearing File Number 2021-0-7527, Case Number 380149459, Case Types: Red Flag, Opened October 18, 2021, Closed July 29, 2022 (the "**Red Flags Case Report**") and File Number 2021-0-8809, Case Number 431061037, Case Types: BSA/AML Transaction out of pattern for customer(s), Opened December 28, 2021, Resolved Date August 10, 2022 ("**BSA/AML Case Report**").

102.    Berkshire Bank produced the Red Flags Case Report and BSA/AML Case Report to Stevens in pre-suit discovery with heavy redactions under the heading  "Case Actions" and "Resolution."

103.    Although the BSA/AML Case Report states that it was opened on December 28, 2021 and was resolved on August 10, 2022, Berkshire Bank's BSA Manager made a curiously belated entry on the report on June 24, 2024 (between the June 12, 2024 filing date of the Ponzi Motion with supporting Declarations and the July 22, 2024 entry date of the Ponzi Order) stating "I currently do not see signs of any account being used as a Ponzi scheme.  Account activity appears to be reasonable." This retroactive "papering over" of a purported investigation evidences the Bank's desire to conceal its own misconduct—and  notably, the BSA Manager's conclusion is surrounded by five text boxes containing the word "Redacted" therein.

104.    In a related Case Summary, Berkshire Bank also heavily redacted content under the heading "Case Actions".  The Case Summary also has a large text box containing the word "Redacted" adjacent to entries dated October 18, 2021 through July 19, 2024.

105.    On March 28, 2023, New York Attorney General Letitia James announced her office's investigation into Marshall. As discussed in detail throughout this Complaint, that investigation ultimately resulted in a 49-count Indictment for securities fraud, grand larceny, and scheme to defraud in the first degree—all of which occurred during the time Marshall banked exclusively with Berkshire Bank.

106.    On March 29, 2023, a Berkshire Bank representative notified other representatives of a "news briefing from last night on our local news regarding an Oriskany Falls branch business customer of ours, M Burton Marshall/Miles B Marshall who is currently under investigation by the NYSAG.  I wanted to provide to you in case you were not already aware." Berkshire Bank's Assistant Vice President, Security and Fraud Investigations, Financial Intelligence Unit acknowledged his familiarity with Marshall by remarking, "Interesting.  This is a name from the past."

107.    Berkshire Bank continued to do business with Marshall, even after it became public knowledge that he had perpetrated a fraudulent investment scheme and victimized hundreds of members of the community and surrounding states.

108.    Inexplicably, Berkshire Bank completed an Enhanced Due Diligence Checklist for Marshall on November 27, 2023 (or seven months *after* the filing of the Bankruptcy Case) (the "**EDD Checklist**").  Like several other documents produced by Berkshire Bank to Stevens in pre-suit discovery, the EDD Checklist was heavily redacted.

109.    As reflected above, Berkshire Bank substantially assisted Marshall's fraud, misuse, and misappropriation of assets from 2015 through 2023 by accepting deposits to consummate the sale of unregistered promissory notes, allowing Marshall's commingled accounts to remain open, and by continuing to process thousands of transactions involving the deposit and disbursement of investor funds totaling tens of millions of dollars to keep the scheme afloat. Simply put, Marshall's scheme could not have continued without Berkshire Bank's substantial assistance.

110.    Berkshire Bank knowingly pursued its business objectives of maximizing assets held and generating substantial fees, charges, interest, and other forms of revenue while innocent investor victims were losing tens of millions of dollars on account of Marshall's Ponzi scheme.

111.    Berkshire Bank's knowing substantial assistance to Marshall in running a Ponzi scheme has caused significant damages to Marshall's innocent investor victims.

112.    All conditions precedent to the filing of this action have been performed, waived, satisfied, or have otherwise occurred.

113.    The delayed discovery doctrine, the continuing violations doctrine and equitable tolling apply to all causes of action herein.

114.    On May 23, 2025, the parties to this action executed a Tolling Agreement providing for a Termination Date of December 1, 2025, unless earlier terminated in accordance with its terms. On August 27, 2025, Plaintiffs notified Berkshire Bank they were exercising their early termination right.  On September 1, 2025, Berkshire Bank's parent company completed its merger with Brookline Bancorp.

### F.    CLASS ACTION ALLEGATIONS

115.    The Noteholder Investors seek to pursue their claims on behalf of a class of similarly situated persons pursuant to Fed. R. Civ. P. 23.  The parameters of the class may be refined through discovery and will be subject to Court approval and modification, but for purposes of this complaint, the Noteholder Investors propose the following class definition:

*All persons who invested money with and/or loaned money to M. Burton Marshall during the period Marshall maintained his accounts at Berkshire Bank with legally cognizable claims.*

116.    The Noteholder Investors further propose that the following persons be excluded from any certified class: (i) the investors who assigned their Bank Litigation Claims to the Assignee; (ii)

the Defendant, its current or former officers, directors, trustees, legal representatives, employees; (iii) any and all companies or entities affiliated with Defendant, their current or former officers, directors, legal representatives, employees, parent companies, subsidiaries, affiliates, predecessors, successors, or assigns; and (iv) all judicial officers and associated court staff assigned to this case and their immediate family members.

117.    The proposed class meets the requirements for class certification pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

118.    *Numerosity*: The class is sufficiently numerous such that individual joinders are impracticable. The Bankruptcy Court has already determined that there are 985 noteholder investors.

119.    *Commonality*: The Noteholder Investors' and class members' claims against Berkshire Bank present common questions of law and fact, including:

    a)    Whether Marshall committed securities fraud and other fraud on the class members, as charged in the New York State Attorney General's 49-count Indictment;

    b)    Whether Marshall breached fiduciary duties owed to class members;

    c)    Whether Marshall converted property belonging to class members;

    d)    What Berkshire Bank knew about Marshall's fraudulent investment scheme and when it knew it;

    e)    Whether the information Berkshire Bank knew about Marshall's fraudulent investment scheme constitutes actual knowledge under the law of aiding and abetting;

    f)    What transactions or other activities Berkshire Bank performed for Marshall and his businesses, including, without limitation, the Marshall 8% Fund;

g)     Whether Berkshire Bank's activities constitute substantial assistance under the law of aiding and abetting;

h)     Whether Berkshire Bank was unjustly enriched; and

i)     Whether Berkshire Bank should be ordered to disgorge any and all monies unlawfully obtained in connection with its failure to exit the banking relationship with Marshall by shutting down his accounts.

120.    *Typicality*: The Noteholder Investors' claims against Berkshire Bank are typical of the class's claims. The Noteholder Investors and class members were all victims of Marshall's fraudulent investment scheme, each has claims against Berkshire Bank for aiding and abetting that scheme, and each claim will depend on common proof that Berkshire Bank knew about Marshall's fraudulent investment scheme and substantially assisted the scheme.

121.    *Adequacy*: The Noteholder Investors are members of the class and will fairly and adequately protect its interests. The Noteholder Investors' interests are aligned with those of the class, as each seeks to recover from Berkshire Bank for aiding and abetting the fraudulent investment scheme that caused them financial harm.

122.    *Predominance*: The common questions identified above are likely to predominate at trial when compared to any individualized issues that may arise. The major issues upon which Berkshire Bank's liability depends – namely, whether Berkshire Bank had actual knowledge of Marshall's fraudulent investment scheme and substantially assisted the scheme – are each susceptible to generalized proof that would establish Berkshire's liability as to all class members through a single trial.

123.    *Superiority*: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Successfully prosecuting class members' claims is likely to require intensive discovery of a multi-billion dollar financial institution, review of large amounts of

electronically stored information, and hiring of financial experts to explain and interpret the significance of both Marshall's and Berkshire Bank's records. These matters are best handled through unified class-wide representation, which can be conducted on a contingency fee basis and offers class members economies of scale unavailable in individual proceedings. A class action also has the benefit of comprehensive supervision by a single court and will avoid the risk of inconsistent results.

124.    In the alternative, the Class may be also certified because:

a)    the prosecution of separate actions by individual noteholder investors would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendant; and/or

b)    the prosecution of separate actions by individual noteholder investors would substantially impair or impede their ability to protect their interests.

125.    Adequate notice can be given to Class members directly using information maintained in records of Marshall's Bankruptcy Case and/or through notice by publication.

126.    Compensatory damages may be calculated, in part, from the information maintained in Defendant's records, as well as the records of members of the Class, so that the cost of administering a recovery for the Class can be minimized.  However, the precise amount of damages available to the Noteholder Investors and the other members of the Class is not a barrier to class certification.

**G.    CLAIMS AGAINST BERKSHIRE BANK**

**COUNT I**
**AIDING AND ABETTING CONVERSION**

127.    The Assignee and Noteholder Investors repeat and reallege each and every allegation set forth in paragraphs 1 through 126 of their Complaint as if set forth at length herein.

128.    Marshall wrongfully asserted dominion and control over the innocent investor funds deposited into his accounts at Berkshire Bank. Investors were told that their funds would be used to

fund Marshall's real estate projects, but in reality they were used to make payments to earlier investors and for his personal expenditures.

129.    Berkshire Bank had actual knowledge of Marshall's fraudulent use of his accounts at the bank to secure and convert funds from innocent investors.  As described in more detail above, this actual knowledge came from, *inter alia*, Berkshire Bank's due diligence and enhanced due diligence conducted and the dozens of surveillance reports generated by its sophisticated account activity monitoring systems (including Verafin, IBS, and Abrigo) prior to and throughout the course of its banking relationship with Marshall. Berkshire Bank also received communications from investors and other banks describing Marshall's investment scheme.

130.    Berkshire Bank rendered substantial assistance to, and aided and abetted Marshall's conversion of innocent investor funds, by accepting deposits to consummate the sale of unregistered promissory notes, allowing Marshall's commingled accounts to remain open, and by continuing to process thousands of transactions involving the deposit and disbursement of investor funds that kept the scheme afloat, all as described in more detail above. Indeed, Berkshire Bank took affirmative steps to make Marshall's fraud easier, including providing him with a scanner that allowed him to deposit up to $300,000 in checks per day. Simply put, Marshall's scheme could not have continued without Berkshire Bank's substantial assistance—particularly insofar as other local banks had already refused to do business with Marshall. As set forth in the New York State Attorney General's Indictment, each and every one of the 49 counts of securities fraud, grand larceny, and scheme to defraud occurred during the time that Marshall banked exclusively with Berkshire Bank.

131.    Berkshire Bank is liable for all damages actually and proximately caused to the Assignee and Noteholder Investors as a result of Marshall's conversion of their funds.

WHEREFORE, the Assignee and Noteholder Investors seek, individually and on behalf of the Class, an order:

a.   Certifying the Class under the appropriate provisions of Rule 23, as well as any appropriate subclasses, and appointing the Noteholder Investors and their counsel to represent the Class;

b.   Entering a judgment against Berkshire Bank for actual compensatory, consequential, incidental, special, and exemplary/punitive damages in an amount to be proven at trial;

c.   Granting such civil penalties as allowed by law;

d.   Granting pre-judgment and post-judgment interest and costs as allowed by law; and

e.   Granting any other relief the Court deems just and proper.

## COUNT II
## AIDING AND ABETTING FRAUD

132.   The Assignee and Noteholder Investors repeat and reallege each and every allegation set forth in paragraphs 1 through 126 of their Complaint as if set forth at length herein.

133.   Marshall perpetrated the fraudulent investment scheme as set forth herein.

134.   Berkshire Bank had actual knowledge of Marshall's fraudulent investment scheme. As described in more detail above, this actual knowledge came from, *inter alia*, Berkshire Bank's due diligence and enhanced due diligence conducted and the dozens of surveillance reports generated by its sophisticated account activity monitoring systems (including Verafin, IBS, and Abrigo) prior to and throughout the course of its banking relationship with Marshall. Berkshire Bank also received communications from investors and other banks describing Marshall's investment scheme.

135.   Berkshire Bank rendered substantial assistance to, and aided and abetted Marshall's fraudulent investment scheme, by accepting deposits to consummate the sale of unregistered promissory notes, allowing Marshall's commingled accounts to remain open, and by continuing to process thousands of transactions involving the deposit and disbursement of investor funds that kept the scheme afloat. Indeed, Berkshire Bank took affirmative steps to make Marshall's fraud easier, including providing him with a scanner that allowed him to deposit up to $300,000 in checks per day,

43

all as described in more detail above. Simply put, Marshall's scheme could not have continued without Berkshire Bank's substantial assistance—particularly insofar as other local banks had already refused to do business with Marshall. As set forth in the New York State Attorney General's Indictment, each and every one of the 49 counts of securities fraud, grand larceny, and scheme to defraud occurred during the time that Marshall banked exclusively with Berkshire Bank.

136.    Berkshire Bank is liable for all damages actually and proximately caused to the Assignee and Noteholder Investors as a result of Marshall's fraud.

WHEREFORE, the Assignee and Noteholder Investors seek, individually and on behalf of the Class, an order:

a.    Certifying the Class under the appropriate provisions of Rule 23, as well as any appropriate subclasses, and appointing the Noteholder Investors and their counsel to represent the Class;

b.    Entering a judgment against Berkshire Bank for actual compensatory, consequential, incidental, special, and exemplary/punitive damages in an amount to be proven at trial;

c.    Granting such civil penalties as allowed by law;

d.    Granting pre-judgment and post-judgment interest and costs as allowed by law; and

e.    Granting any other relief the Court deems just and proper.

## COUNT III
## AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY

137.    The Assignee and Noteholder Investors repeat and reallege each and every allegation set forth in paragraphs 1 through 126 of their Complaint as if set forth at length herein.

138.    Marshall owed a fiduciary duty to clients of Marshall Tax Service and his insurance business Miles B. Marshall, Inc. This duty extended to clients of those businesses who invested in Marshall's 8% Note program.

139.    Marshall was required to discharge his fiduciary duty to clients of Marshall Tax Service and Miles B. Marshall, Inc. in good faith, with ordinary care, and in a manner reasonably believed to be in their best interests.

140.    Marshall breached his fiduciary duty to clients of Marshall Tax Service and Miles B. Marshall, Inc. by using their non-public, proprietary, private, personal and/or other sensitive financial information to solicit and secure funds to perpetuate and prolong his fraudulent investment scheme.

141.    Marshall's breach of fiduciary duties owed to clients of Marshall Tax Service and Miles B. Marshall, Inc. actually and proximately caused financial injury to those client-investors who assigned their Bank Litigation Claims to the Assignee and those client-investors included in the group of Noteholder Investors.

142.    Berkshire Bank had actual knowledge of Marshall's breaches of fiduciary duty to clients of Marshall Tax Service and Miles B. Marshall, Inc.

143.    Berkshire Bank rendered substantial assistance to, and aided and abetted Marshall's breaches of fiduciary duty to clients of Marshall Tax Service and Miles B. Marshall, Inc., by accepting deposits to consummate the sale of unregistered promissory notes, allowing Marshall's commingled accounts to remain open, and by continuing to process thousands of transactions involving the deposit and disbursement of investor funds that kept the scheme afloat. Indeed, Berkshire Bank took affirmative steps to make Marshall's fraud easier, including providing him with a scanner that allowed him to deposit up to $300,000 in checks per day, all as described in more detail above. Simply put, Marshall's scheme could not have continued without Berkshire Bank's substantial assistance—particularly insofar as other local banks had already refused to do business with Marshall. As set forth in the New York State Attorney General's Indictment, each and every one of the 49 counts of securities fraud, grand larceny, and scheme to defraud occurred during the time that Marshall banked exclusively with Berkshire Bank.

144.    Berkshire Bank is therefore liable for all damages actually and proximately caused to those client-investors who assigned their Bank Litigation Claims to the Assignee and those client-investors included in the group of Noteholder Investors as a result of Marshall's breaches of fiduciary duty.

WHEREFORE, the Assignee and Noteholder Investors seek, individually and on behalf of the Class, an order:

a.      Certifying the Class under the appropriate provisions of Rule 23, as well as any appropriate subclasses, and appointing the Noteholder Investors and their counsel to represent the Class;

b.      Entering a judgment against Berkshire Bank for actual compensatory, consequential, incidental, special, and exemplary/punitive damages in an amount to be proven at trial;

c.      Granting such civil penalties as allowed by law;

d.      Granting pre-judgment and post-judgment interest and costs as allowed by law; and

e.      Granting any other relief the Court deems just and proper.

## COUNT IV
## UNJUST ENRICHMENT

145.    The Assignee and Noteholder Investors repeat and reallege each and every allegation set forth in paragraphs 1 through 126 of their Complaint as if set forth at length herein.

146.    Marshall conferred a benefit upon Berkshire Bank by making deposits and disbursements from his accounts, thereby accruing significant transaction/service fees, which Marshall paid with misappropriated investor funds to Berkshire Bank.

147.    Berkshire Bank knowingly and voluntarily accepted and retained the benefits conferred by Marshall with respect to such transaction/service fees.

148.    Berkshire Bank has been unjustly enriched at the expense of the Assignee and Noteholder Investors.

176644894.1

149.    The circumstances are such that it would be inequitable and unjust for Berkshire Bank to retain the benefits conferred by Marshall without paying the Assignee and Noteholder Investors the value thereof.

150.    The Assignee and Noteholder Investors are entitled to the return of those amounts by which Berkshire Bank was unjustly enriched, through disgorgement or another appropriate remedy.

WHEREFORE, the Assignee and Noteholder Investors seek, individually and on behalf of the Class, an order:

a.    Certifying the Class under the appropriate provisions of Rule 23, as well as any appropriate subclasses, and appointing the Noteholder Investors and their counsel to represent the Class;

b.    Entering a judgment against Berkshire Bank for actual compensatory, consequential, incidental, special, and exemplary/punitive damages in an amount to be proven at trial;

c.    Granting such civil penalties as allowed by law;

d.    Granting pre-judgment and post-judgment interest and costs as allowed by law; and

e.    Granting any other relief the Court deems just and proper.

**H.    RESERVATION OF RIGHTS**

151.    The Assignee and Noteholder Investors reserve their right to amend this Complaint, upon completion of their investigation and discovery, to assert any additional claims for relief against the Defendant as may be warranted under the circumstances allowed by law.

**I.    DEMAND FOR JURY TRIAL**

152.    The Assignee and Noteholder Investors hereby demand a trial by jury on all claims and issues triable by such.

Dated:  New York, New York
         September 10, 2025           **FOX ROTHSCHILD LLP**

                                      By: _____/s/ Robert F. Elgidely_____
                                          Robert F. Elgidely, Esq.
                                          Bar Roll No. 502372
                                          101 Park Avenue, 17th Floor
                                          New York, NY 10178
                                          Telephone: (212) 878-7900
                                          Email: relgidely@foxrothschild.com

                                          -and-

                                          Joseph J. DiPasquale, Esq.
                                          Catherine E. Youngman, Esq.
                                          49 Market Street
                                          Morristown, New Jersey 07960
                                          Telephone: (973) 992-4800
                                          Emails:  jdipasquale@foxrothschild.com
                                                   cyoungman@foxrothschild.com

                                          *Special Litigation Counsel to Fred Stevens, Plan*
                                          *Administrator & Assignee of Bank Litigation Claims*

                                          -and-

                                          Daniel B. Centner, Esq.
                                          Peiffer Wolf Carr Kane Conway & Wise LLP
                                          935 Gravier Street, Suite 1600
                                          New Orleans, LA 70112
                                          Email: dcentner@peifferwolf.com

                                          Jason J. Kane, Esq.
                                          Peiffer Wolf Carr Kane Conway & Wise LLP
                                          95 Allens Creek Road, Bldg. 1, Ste. 150,
                                          Rochester, NY 14618
                                          Telephone: (585) 310-5140
                                          F (585) 397-3745
                                          Email: jkane@peifferwolf.com

                                          -and-

                                          Scott L. Silver, Esq.
                                          Peter M. Spett, Esq.
                                          Silver Law Group
                                          11780 W. Sample Road
                                          Coral Springs, FL 33065
                                          Telephone: (954) 755-4799

176644894.1

Emails: ssilver@silverlaw.com
        pspett@spettlaw.com

*Attorneys for the Noteholder Investors*

176644894.1