**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FRED STEVENS, et al.,<br><br>          *Plaintiffs*,<br><br>    v.<br><br>BERKSHIRE BANK, a Massachusetts trust company, n/k/a Beacon Bank & Trust,<br><br>          *Defendant*. | **Case No: 5:25-cv-01256-DNH-TWD** |

**DEFENDANT BERKSHIRE BANK'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT**
**<u>PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(6) AND 9(b)</u>**

**McGuireWoods LLP**

By: *<u>/s/ Megan D. Price</u>*
    Megan D. Price
    Jarrod D. Shaw (*admitted pro hac vice*)
    Nellie E. Hestin (*admitted pro hac vice*)
    Tower Two-Sixty
    260 Forbes Avenue, Suite 1800
    Pittsburgh, PA 15222
    Phone: (412) 667-6000
    mprice@mcguirewoods.com
    jshaw@mcguirewoods.com
    nhestin@mcguirewoods.com

*Attorneys for Defendant Berkshire Bank*

# TABLE OF CONTENTS

**Page**

I.   The O'Dell Action ............................................................................................ 3

II.  Factual Allegations in the Stevens Complaint ................................................. 3

    A.  Marshall's Scheme ................................................................................4

    B.  Allegations Against Berkshire ..............................................................4

    C.  Misleading Factual Allegations Cannot Overcome Pleading Deficiencies ............5

III. Legal Standard .................................................................................................. 9

IV.  Argument .......................................................................................................... 9

    A.  Counts I-III do not meet the standard for pleading aiding and abetting liability...10

    B.  Plaintiffs fail to plead facts giving rise to a strong inference that Berkshire had actual knowledge of Marshall's scheme ..............13

        1.  There is nothing improper with "commingling" funds within sole proprietorship and personal accounts ........................................13

        2.  Allegations that Berkshire knew that Marshall was soliciting investments from third parties is insufficient to prove actual knowledge ........................15

        3.  NBT Bank never provided Berkshire with actual knowledge of a Ponzi scheme ..............18

        4.  BSA Alerts did not provide Berkshire with actual knowledge of Marshall's Ponzi scheme ..............19

        5.  Large cash transactions do not provide actual knowledge of a Ponzi scheme ..............20

        6.  A large business in a small town does not provide actual knowledge of fraud ..............21

    C.  Plaintiffs fail to show that Berkshire provided substantial assistance to Marshall's fraud ..............22

    D.  Plaintiffs' Claim for Aiding and Abetting Breaches of Fiduciary Duty also fails because Plaintiffs have not pleaded that Marshall owed any fiduciary duties ..............23

    E.  Plaintiffs fail to plead an unjust enrichment claim because Berkshire did not receive a benefit at Plaintiffs' expense ..............24

V.   Conclusion ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AHA Sales, Inc. v. Creative Bath Prods., Inc.,*
    867 N.Y.S.2d 169 (App. Div. 2008) ...................................................................24

*Anwar v. Fairfield Greenwich Ltd.,*
    728 F. Supp. 2d 372 (S.D.N.Y. 2010) ................................................................3

*Berman v. Morgan Keegan & Co.,*
    No. 10 Civ. 5866, 2011 WL 1002683 (S.D.N.Y. Mar. 14, 2011) .........................11

*Cf. Hesse v. Godiva Chocolatier, Inc.,*
    463 F.Supp.3d 453 (S.D.N.Y. 2020) ..................................................................25

*Cf. Tyson v. Town of Ramapo,*
    No. 17-CV-4990, 2019 WL 1331913 (S.D.N.Y. Mar. 25, 2019) ..........................6

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002) ..............................................................................6

*Chemtex, LLC v. St. Anthony Enters., Inc.,*
    490 F.Supp.2d 536 (S.D.N.Y. 2007) ..................................................................17

*Faith Assembly v. Titledge of N.Y. Abstract, LLC,*
    961 N.Y.S.2d 542 (2013) ...................................................................................23

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.,*
    479 F. Supp. 2d 349 (S.D.N.Y. 2007) ...............................................................11

*Georgia Malone & Co., Inc. v. Rieder,*
    973 N.E.2d 743 (N.Y. 2012) .............................................................................25

*Heinart v. Bank of America, N.A.,*
    835 F. App'x 627 (2d Cir. 2020) ................................................................13, 15

*Heinert v. Bank of America, N.A.,*
    410 F. Supp. 3d 544 (W.D.N.Y. Oct. 18, 2019) ................................................20

*Hussein v. Bank of America, N.A.,*
    No. 24-CV-4477, 2025 WL 2783108 (E.D.N.Y. Sept. 30, 2025) .........................23

*In re Agape Litig,*
    681 F. Supp. 2d 352 (E.D.N.Y. 2010) ...............................................................12

*In re Agape Litig.,*
   773 F. Supp. 2d 298 (E.D.N.Y. 2011) ............................................................ *passim*

*In re Stillwater Asset Backed Offshore Fund Ltd.,*
   No. 16 CIV. 8883, 2018 WL 1610416 (S.D.N.Y. Mar. 30, 2018) ...................................10, 24

*Kaye v. Grossman,*
   202 F.3d 611 (2d Cir. 2000)......................................................................25

*Kolbeck v. LIT America, Inc.,*
   939 F. Supp. 240 (S.D.N.Y. 1996) ...........................................................11, 18

*Lattanzio v. COMTA,*
   481 F.3d 137 (2d Cir. 2007)......................................................................14

*Lerner v. Fleet Bank, N.A.,*
   459 F.3d 273 (2nd Cir. 2006)..................................................................10, 21

*Maersk Line A/S v. Carew,*
   588 F. Supp. 3d 493 (S.D.N.Y. 2022).............................................................14

*Mandarin Trading, Ltd. v. Wildenstein,*
   944 N.E.2d 1104 (N.Y. 2011)....................................................................25

*Mazzaro de Abreu v. Bank of America Corp.,*
   525 F.Supp.2d 381 (S.D.N.Y.2007)...........................................................17, 21

*Mora v. N.Y. State Unified Ct. Sys.,*
   No. 22-CV-10322, 2023 WL 6126486 (S.D.N.Y. Sept. 19, 2023)...........................................6

*Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.,*
   14 F. Supp. 3d 191 (S.D.N.Y. 2014).............................................................23

*Nathel v. Siegal,*
   592 F.Supp.2d 452 (S.D.N.Y.2008)...............................................................17

*Nemec v. Shrader,*
   991 A.2d 1120 (Del. 2010) ......................................................................24

*Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.,*
   No. 98 Civ. 4690, 1999 WL 558141 (S.D.N.Y. July 30, 2009) ........................................17

*O'Dell v. Berkshire Bank,*
   No. 5:24-CV-652, 2024 WL 4635262 (N.D.N.Y. Oct. 31, 2024) .................................. *passim*

*Pauwels v. Deloitte LLP,*
   83 F.4th 171 (2d Cir. 2023) ..................................................................10, 24

*Renner v. Chase Manhattan Bank,*
　No. 98-cv-926, 2000 WL 781081 (S.D.N.Y. June 16, 2000), *aff'd*, 85 F.
　App'x 782 (2d Cir. 2004) ........................................................................................13

*Roni LLC v. Arfa,*
　963 N.E.2d 123 (N.Y. 2011) ....................................................................................23

*Rosner v. Bank of China,*
　No. 06 CV 13562, 2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008), *aff'd*, 349 F.
　App'x 637 (2d Cir. 2009) ..........................................................................12, 16, 22

*Ryan v. Cmty. Based Servs., Inc.,*
　No. 24-CV-2801, 2025 WL 2709126 (S.D.N.Y. Sept. 23, 2025) ...............................6

*Ryan v. Hunton & Williams,*
　No. 99 Civ 5938, 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ............................18

*Silverman v. Citibank, N.A.,*
　No. 1:22-CV-5211, 2023 WL 7305243 (S.D.N.Y. Nov. 6, 2023) ............................14

*Sperry v. Crompton Corp.,*
　63 N.E.2d 1012 (N.Y. 2007) ....................................................................................25

*U.S. Postal Serv. v. Net, Inc.,*
　225 F.R.D. 416 (E.D.N.Y.2005) ..............................................................................14

*Vasquez v. H.K. & Shanghai Banking Corp.,*
　No. 18 Civ. 1876, 2019 WL 2327810 (S.D.N.Y. May 30, 2019) ............................11

*Wight v. BankAmerica Corp.,*
　219 F.3d 79 (2d Cir. 2000), *aff'd*, 455 F. App'x 92 (2d Cir. 2012) .......................11

*Yao-Yi v. Wilmington Trust Co.,*
　301 F. Supp. 3d 403 (W.D.N.Y. 2017) ....................................................................15

*Zim Am. Integrated Shipping Servs., Co., LLC v. Sportswear Grp., LLC,*
　No. 20-cv-4838, 2021 WL 5450117 (S.D.N.Y. Nov. 18, 2021) ..............................24

**Rules**

12 C.F.R. §21.11(k) ............................................................................................................20

31 CFR § 1020.320(e) ........................................................................................................20

31 U.S.C. § 5318(g)(2)(A)(i) .............................................................................................20

Berkshire Bank[1] is again before this Court being accused of aiding and abetting a Ponzi scheme perpetrated by M. Burton Marshall. Just last year, an investor (represented by the same class counsel here) tried the same thing and failed. *See O'Dell v. Berkshire Bank*, No. 5:24-CV-652, 2024 WL 4635262 (N.D.N.Y. Oct. 31, 2024). The court dismissed the case—with prejudice—finding that O'Dell failed to allege that Berkshire possessed "actual knowledge" or "substantially assisted" Marshall's Ponzi scheme. *Id.* at *5.

Here, the plan administrator overseeing the claims in the Marshall "Eight Percent Fund," and additional investors (together, "Plaintiffs") are trying again to hold Berkshire liable for the actions of Marshall. Plaintiffs' theory again is that Berkshire's provision of routine banking services rendered it an aider and abettor of Marshall's Ponzi scheme and that Berkshire should be responsible for making the victims of the scheme whole.

As courts repeatedly recognize, a plaintiff states an aiding-and-abetting claim only if the complaint pleads facts giving rise to a strong inference that the defendant had *actual knowledge* of the underlying fraud. It is not enough to simply *say* the defendant had knowledge; facts must be averred from which such knowledge can be strongly inferred. And as these courts have explained, merely alleging a bank "should have known" or "must have known" of a fraud based on allegations regarding "irregularities" in the account or "suspicious" transactions is not sufficient.

Despite Plaintiffs now having the benefit of extensive discovery,[2] Plaintiffs have not alleged any new facts that demonstrate that Berkshire had any actual knowledge of or substantially

---

[1] Berkshire Hills Bancorp Inc., the parent company of Berkshire Bank, recently merged with Brookline Bancorp, Inc., to create Beacon Financial Corporation, the parent company of Beacon Bank & Trust, commonly known as Beacon Bank, the successor by merger to Berkshire Bank. https://tinyurl.com/3jusujh6. For this motion, defendant will refer to itself as Berkshire.

[2] To date, Berkshire has produced 2,277 documents constituting 63,949 pages to the Plan Administrator, and the Plan Administrator has examined a Berkshire corporate witness pursuant to Rule 2004 of the Federal Rules of Bankruptcy.

assisted Marshall's fraud.  Like in *O'Dell*, Plaintiffs continue to plead red flags and suspicious activity which fail to sufficiently allege actual knowledge.  For example, Plaintiffs add more allegations than *O'Dell* regarding account activity and alerts Berkshire received regarding Marshall's accounts.  But these continue to tell the same story this Court previously rejected. Plaintiffs also plead that another bank warned Berkshire that Marshall *may* be committing a Ponzi scheme.  Critically though, Plaintiffs do not (and cannot) plead that Berkshire then concluded Marshall actually was doing anything nefarious—it did not.  Such warnings and suspicions have been rejected in this circuit, as courts have held that warnings from third parties are not enough to demonstrate *actual* knowledge of fraud.

Plaintiffs are also required to plead that Berkshire substantially assisted the underlying fraud.  Here, too, the caselaw unequivocally establishes that the Complaint fails just as it did in *O'Dell*.  Courts universally hold that that the provision of routine banking services does not constitute substantial assistance as a matter of law, which is what Plaintiffs—like *O'Dell*—plead here.  Plaintiffs have also added an allegation that Berkshire substantially assisted Marshall by providing him with remote deposit services for large checks, but this too has been found to not demonstrate substantial assistance under the law.  It is nothing more than a routine banking service available to every commercial customer of Berkshire.  *See* Remote Deposit Capture at Berkshire, https://tinyurl.com/remote-deposit (offering remote deposit services to Berkshire customers).

At bottom, Plaintiffs, unable to recover funds from Marshall, are attempting to hold Berkshire liable for providing Marshall with ordinary and routine banking services.  While Berkshire sympathizes with investors who lost money from Marshall's fraudulent scheme, that does not render Berkshire liable.  Just as plaintiff's claim against Berkshire failed in *O'Dell*, here too Plaintiffs' claims against Berkshire fail under New York law.

2

## I.    THE *O'DELL* ACTION

On May 13, 2024, Mark S. O'Dell sued Berkshire Bank for allegedly aiding and abetting M. Burton Marshall's Ponzi scheme. *O'Dell,* 2024 WL 4635262, at *1. O'Dell, like Plaintiffs here, was allegedly an investor who fell victim to Marshall's fraud and sought to hold Berkshire liable. O'Dell alleged that Berkshire had actual knowledge of Marshall's fraud because: (1) Marshall's Berkshire account was allegedly the largest and most transactionally active account at Berkshire's Oriskany Falls branch prior to the branch's closure in 2021; (2) Berkshire had legal and compliance requirements which should have required a heightened degree of diligence and scrutiny into high volume clients such as Marshall, which would have alerted Berkshire to Marshall's fraudulent activity; and (3) Berkshire's know-your-customer ("KYC"), anti-money laundering ("AML) and its own compliance procedures. *Id.* at *3.

The Court held that none of O'Dell's allegations showed Berkshire had actual knowledge of Marshall's fraud. "[T]he mere fact that defendant should have known Marshall was conducting a Ponzi scheme is insufficient to demonstrate actual knowledge for purposes of a common law claim of aiding-and-abetting fraud." *Id.* at *4 (citing *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 442-43 (S.D.N.Y. 2010)). The Court also found that even if O'Dell's allegations of actual knowledge were sufficient, the claim still failed because O'Dell did not plausibly allege that Berkshire provided "substantial assistance" to Marshall in perpetrating the fraud. *Id.* The Court dismissed *O'Dell* with prejudice and without leave to amend the dismissed complaint. *Id.* at *5.

## II.    FACTUAL ALLEGATIONS IN THE *STEVENS* COMPLAINT

Unable to amend their complaint in the failed *O'Dell* case, the same counsel from *O'Dell*, along with counsel for the plan administrator, are bringing the same case against Berkshire again— this time using more sensational language and including amplified factual allegations along with additional aiding and abetting and unjust enrichment claims. Here, like in *O'Dell*, Plaintiffs allege

Berkshire had actual knowledge of Marshall's wrongdoing based on red flags and suspicious activity and substantially assisted Marshall by providing ordinary banking services. Devoid from the Complaint again are any allegations that Berkshire actually became aware of Marshall's fraud because, as Plaintiffs well know, it did not. That omission is fatal to their case.

### A. Marshall's Scheme

According to the Complaint, Marshall operated a variety of unincorporated businesses as sole proprietorships. Compl. ⁋ 64. Marshall further maintained six sole proprietorship accounts for his businesses at Berkshire in addition to an individual account under his name (the "2301 Account"). *Id.* ⁋ 5. Plaintiffs allege that "[o]ver the course of several decades, Marshall actively solicited and secured approximately $90 million from approximately 1,000 noteholder investors to whom he promised an 8% return on their money." *Id.* ⁋ 72. In reality, according to the Complaint, Marshall's investment scheme was "Ponzi-like," and he used new investor funds to repay prior investors. *Id.* ⁋ 76. As a result of Marshall's scheme, hundreds of noteholders lost the majority of their investment. *Id.* ⁋ 79. Plaintiffs allege Marshall used his Berkshire accounts, primarily the 2301 Account, to solicit investments and funnel money. *Id.* ⁋ 12.

### B. Allegations Against Berkshire

First, Plaintiffs allege Berkshire knew that Marshall commingled money in his personal and sole proprietorship accounts. *Id.* ⁋⁋ 9, 81. Second, Berkshire classified Marshall as a "high-risk" business customer based on its KYC obligations. *Id.* ⁋ 68. Third, Plaintiffs allege that Marshall's account activity triggered numerous Bank Secrecy Act ("BSA") and other alerts on Berkshire's account activity monitoring systems from at least 2017 through 2023. *Id.* ⁋ 13. Next, Plaintiffs allege Berkshire knew that Marshall was soliciting investments from third parties and

depositing those investments into his accounts. *Id.* ¶¶ 12, 14, 82, 86-90, 95. As alleged, Marshall's checks and wire transfers included notations related to third party investments. *Id.* ¶¶ 92, 93.

Plaintiffs also allege that NBT Bank informed Berkshire that Marshall "may be running a Ponzi scheme" in an email sent to Berkshire on October 18, 2021—six years after Plaintiffs allege Marshall became a customer of Berkshire. *Id.* ¶¶ 4, 14, 91, 92. Plaintiffs then allege that on June 24, 2024, Berkshire's BSA Manager made a belated entry on an internal investigation report with a "Resolved Date" of "10-Aug-2022" stating that Berkshire "currently do[es] not see signs of any account being used as a Ponzi scheme. Account activity appears to be reasonable." *Id.* ¶¶ 17, 103. Because the 2024 entry happened two years after the 2022 "Resolved Date" entry, Plaintiffs allege the 2024 entry is a "retroactive 'papering over' of a purported investigation." *Id.* Plaintiffs further allege that Berkshire knew that Marshall ran a high cash business and had submitted 41 Currency Transaction Reports ("CTRs"). *Id.* ¶¶ 14, 98. Finally, Plaintiffs allege Marshall's businesses were in a small town, and therefore Berkshire's branch employees would have known Marshall's employees "on a personal level." *Id.* ¶ 66, 99. Importantly, the Complaint does not allege that any of Marshall's employees were aware of the Ponzi scheme. Nor does the Complaint allege that any Berkshire employees actually learned of Marshall's fraudulent activity.

The Complaint then alleges that Berkshire substantially assisted Marshall's Ponzi scheme by providing Marshall with a remote scanner for check deposits and continuing to provide Marshall with ordinary banking services. *Id.* ¶¶ 94, 109.

### C. Misleading Factual Allegations Cannot Overcome Pleading Deficiencies

Throughout the Complaint, Plaintiffs include partial statements and quotes from documents and emails Berkshire produced, which are integral to Plaintiffs' allegations. The Court can consider these documents in their entirety, and not just the portions selectively included by

Plaintiffs, because the "Complaint makes 'clear, definite[,] and substantial reference' to the documents such that they are incorporated by reference." *Ryan v. Cmty. Based Servs., Inc.*, No. 24-CV-2801, 2025 WL 2709126, at *1 (S.D.N.Y. Sept. 23, 2025).[3]

Here, in seven different paragraphs, Plaintiffs refer to an email NBT Bank sent to Berkshire that Marshall "may be running a Ponzi scheme," Compl. ¶¶ 4, 15, 91, 92, 94, 99, 101, and use this as evidence that Berkshire had actual knowledge of Marshall's Ponzi scheme. However, Plaintiffs fail to include the rest of the NBT email chain, which shows that Berkshire requested that NBT send it information about their concerns—"[t]he more the better." *See* Ex. A, Email with NBT Bank (Oct. 20, 2021). But there was no further response from NBT, nor do Plaintiffs allege otherwise. This exchange clearly shows Berkshire did not have actual knowledge of Marshall's wrongdoing from the NBT email. To the contrary, it sought, but did not receive, any additional information. Moreover, Plaintiffs allege that Berkshire opened a fraud case after receiving the NBT email on December 28, 2021 which concluded that Berkshire did not find evidence of Marshall's accounts being used as a Ponzi scheme. Compl. ¶¶ 17, 103.

In addition, the BSA alerts that Plaintiffs allege Berkshire received regarding Marshall's account activity are integral to Plaintiffs' allegations that Berkshire had actual knowledge of Marshall's scheme. Compl. ¶¶ 13, 82, 85, 86, 99. Specifically, the alerts quoted in paragraph 86 of the Complaint speak to Marshall "accepting cash investments" and receiving loans from

---

[3] *Cf. Tyson v. Town of Ramapo*, No. 17-CV-4990, 2019 WL 1331913, at *2 (S.D.N.Y. Mar. 25, 2019) (finding that two letters were incorporated by reference where they were cited and discussed in the operative complaint, and they "relate[d] to [plaintiff's] termination, which [was] a matter at the core of th[e] case"); *see also e.g.*, *Mora v. N.Y. State Unified Ct. Sys.*, No. 22-CV-10322, 2023 WL 6126486, at *2 n.5 (S.D.N.Y. Sept. 19, 2023) (finding that documents were integral to the complaint because the plaintiff's allegations "concern[ed]" the documents in question (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002))).

individuals.  But rather than providing the full text of the alerts, Plaintiffs cut them off and do not

inform the Court that each one concluded, in real time, ***that no suspicious activity was found***:[4]

- February 24, 2018:
  - **Plaintiffs cite**: "some of his investors had cash they wished to invest with Marshall. He gains investors by word of mouth from the people he has been working with for years.";

  - ***Plaintiffs omit***: "No wires, no RDC. nothing potentially suspicious found."

- March 24, 2018:
  - **Plaintiffs cite**: "cash deposits are most likely rental payments as well as investment money, as ***he is well-known for accepting cash investments***.";

  - ***Plaintiffs omit***: "This does not appear to be potential suspicious activity.  Close."

- April 21, 2018:
  - **Plaintiffs cite**: "cash deposits are most likely rental payments as well as investment money, as ***he is well-known for accepting cash investments.***";

  - ***Plaintiffs omit***: "In reviewing account over the past year, activity appears to be normal with no inconsistencies. Close"

- May 19, 2018:
  - **Plaintiffs cite**: "cash deposits are most likely rental payments as well as investment money, as ***he is well-known for accepting cash investments***.";

  - ***Plaintiffs omit***: "In reviewing account over the past year, there does not appear to be structuring. Close."

- October 6, 2018:
  - **Plaintiffs cite**: "after getting in touch with Burton Marshall ***it was noted in BSA***: 'when buying properties Marshall prefers to work with individuals who loan him the money for the purchase or the improvements. *This gives him more flexibility than working with the banks*.  He has been working with these individuals for years.  ***You will see large checks (sic) deposits which represent the funds being lent to Marshall.  You will also see checks he pays out marked loan note disbursement which are the returns with interest.***'  This explanation clarifies the source of the funds....";

  - ***Plaintiffs omit***: "'This account also has mortgage and utility payments as well as tax bills. He keeps all the business related to these investments together as his system of

---

[4] "Plaintiffs cite" references are from paragraph 86 of the Complaint (emphases added by plaintiffs), and "Plaintiffs omit" references come from the full document, attached as Ex. B.

organizing them. During certain times of the year you will see spikes in activity related to taxes, etc.' This explanation clarifies the source of the funds and the reasoning behind the on-us checks. I'm clearing the alert because I feel the activity is reasonable for this consumer due to the fact that this is his business account and appears to coincide with regular business activities, therefore it doesn't warrant further investigation. Close."

- <u>January 26, 2019</u>:
  - o **Plaintiffs cite**: "According to a previous alert, when buying properties or making improvements on a property, Burton Marshall acquires loans from individuals";

  - o ***<u>Plaintiffs omit</u>***: "This alert is being cleared because the activity is reasonable for this customer, the activity is consistent with previous history, and therefore it doesn't warrant further investigation. Cleared."

- <u>April 20, 2019</u>:
  - o **Plaintiffs cite**: "All other account activity supports an IORTA VT account or escrow account for this business/business owner.";

  - o ***<u>Plaintiffs omit</u>***: "This alert is going to be cleared because it is reasonable for a high scale business like this to have cash deposits this frequently and consistently as well as all are made at the same branch, which does not appear to be structuring. Overall during the review period no unusual activity occurred and no suspicious activity was detected, account activity appears to be reasonable. Close."

- <u>July 22, 2019</u>:[5]
  - o **Plaintiffs cite**: "During the month of June 2019, account 692301 had an incoming wire spike of 200% when compared to the last 3 months of activity";

  - o ***<u>Plaintiffs omit</u>***: "This alert is being cleared because the activity is reasonable for this customer, therefore it does not warrant further investigation."

- <u>July 11, 2020</u>:
  - o **Plaintiffs cite**: "***We were concerned about the activity in account 692301*** and reached out to Barb Misiaszek to contact Marshall to gain an understanding of the activity. When buying properties Marshall prefers to work with individuals who loan him the money for the purchase or the improvements. *This gives him more flexibility than working with the banks*. He has been working with these individuals for years. ***You will see large check deposits which represent the funds being lent to Marshall. You will also see checks he pays out marked loan note disbursement which are the returns with interest.***"

  - o ***<u>Plaintiffs omit</u>***: "As incoming cash activity is an anticipated and reasonable occurrence for this business type with CTRs filed as needed, all cash income used

---

[5] Plaintiffs use "July 22, 2019" in paragraph 86, but the quoted cite is from July 13, 2019.

towards business related monthly payments and transfers, and overall account activity remaining consistent and reasonable for this business type with cash income made nearly daily; overall account activity appears reasonable with no abnormal activity observed at this time. Close."

Plaintiffs' omission of these comments is striking given they show contemporaneous conclusions Berkshire reached demonstrating, in plain language, that it ***did not know*** Marshall was running a Ponzi scheme and did not find any suspicious activity.

### III.    <u>LEGAL STANDARD</u>

Plaintiffs have re-written the *O'Dell* complaint using more sensational language to describe the same core factual allegations. *See* No. 5:24-CV-652, ECF No. 1. The same standard should apply as in *O'Dell*, and Berkshire incorporates that standard here. *See* 2024 WL 4635262, at *1.

### IV.    <u>ARGUMENT</u>

Plaintiffs' Complaint fails for the same reasons as in *O'Dell*—they have not pleaded any factual allegations that show that Berkshire had actual knowledge of or substantially assisted Marshall's Ponzi scheme. *See In re Agape Litig.*, 773 F. Supp. 2d 298, 307 (E.D.N.Y. 2011) ("*Agape II*") ("To plausibly state a claim premised on aiding and abetting, New York law requires the plaintiff to 'allege (i) the existence of a violation by the primary wrongdoer; (ii) knowledge of the violation by the aider and abettor; and (iii) proof that the aider and abettor substantially assisted in the primary wrong.'") (citation omitted). Here, even with the benefit of thousands of documents, Plaintiffs still have not alleged that Berkshire ever had knowledge of Marshall's Ponzi scheme. The most Plaintiffs allege is that Berkshire was aware of a series of red flags and suspicious activity, which fails under the law. *See e.g.*, *id.* at 309 ("'red flags' or badges of fraud in account activity, which 'merely show that [defendant] had *constructive knowledge* of [fraudster's] scheme'" fails to support actual knowledge of fraud). Indeed, "allegations of 'red flags' and suspicious circumstances, which in hindsight may appear to indicate the obviousness of the fraud

. . . fail to rise to level of specificity that New York state courts and courts in the Second Circuit have routinely required before holding that a plaintiff has sufficiently alleged facts that raise a strong inference of actual knowledge from circumstantial evidence." *Id.* at 318-19.

Plaintiffs' unjust enrichment claim also fails because Plaintiffs cannot demonstrate that any benefit that Berkshire received was "at plaintiff[s'] expense" because the relationship between Berkshire and Plaintiffs is too attenuated. *See e.g.*, *Pauwels v. Deloitte LLP*, 83 F.4th 171, 186 (2d Cir. 2023) ("[A]n unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."); *In re Stillwater Asset Backed Offshore Fund Ltd.*, No. 16 CIV. 8883, 2018 WL 1610416, at *12 (S.D.N.Y. Mar. 30, 2018) ("[U]njust enrichment cannot be supported if the connection between the parties is too attenuated.").

Consequently, like *O'Dell*, Plaintiffs' Complaint should again be dismissed with prejudice.

## A. Counts I-III do not meet the standard for pleading aiding and abetting liability.

Plaintiffs allege in Counts I, II, and III that Berkshire aided and abetted Marshall's conversion, fraud, and breaches of fiduciary duties. Compl. ¶¶ 127-144. To plausibly state an aiding and abetting claim under New York law, Plaintiffs must plead "(i) the existence of a violation by the primary wrongdoer; (ii) knowledge of the violation by the aider and abettor; and (iii) proof that the aider and abettor substantially assisted in the primary wrong." *Agape II*, 773 F. Supp. 2d at 307; *see also e.g.*, *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2nd Cir. 2006) (explaining "actual knowledge is required to impose liability on an aider and abettor under New York law")) (citation omitted). Moreover, the plaintiff must "allege actual knowledge of fraud with the particularity necessary to survive the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)." *Id.* at 292-93. This requires "plead[ing] facts giving rise to the 'strong inference' of actual knowledge of fraud[.]" *Id.*

The "heightened pleading requirement of Rule 9(b) applies equally to claims alleging aiding and abetting fraud, claims alleging aiding and abetting breach of fiduciary duty sounding in fraud, and claims alleging aiding and abetting conversion premised on fraud." *Berman v. Morgan Keegan & Co.*, No. 10 Civ. 5866, 2011 WL 1002683, at *7 (S.D.N.Y. Mar. 14, 2011) (citing *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000)), *aff'd*, 455 F. App'x 92 (2d Cir. 2012). Here, "because all aiding and abetting claims relate to the underlying fraud alleged against [Berkshire], each is subject to Rule 9(b)'s heightened pleading requirements." *Vasquez v. H.K. & Shanghai Banking Corp.*, No. 18 Civ. 1876, 2019 WL 2327810, at *15 (S.D.N.Y. May 30, 2019).

Though "not insurmountable," the "burden of demonstrating actual knowledge . . . is nevertheless a heavy one." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.*, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007). In particular, factual allegations giving rise to a strong inference of actual knowledge must be contrasted against allegations suggesting the defendant only had "constructive knowledge, [which] is not enough to support a claim for aiding and abetting[.]" *Kolbeck v. LIT America, Inc.*, 939 F. Supp. 240, 246-47 (S.D.N.Y. 1996) ("New York common law . . . has not adopted a constructive knowledge standard for imposing aiding and abetting liability. Rather, New York courts and federal courts in this district have required actual knowledge.").

Plaintiffs bringing aiding-and-abetting claims against banks following collapsed frauds often allege the bank "must have known" of the fraud because the activity in the account (or the circumstances of the customer's relationship with the bank) generated various "red flags." But as *Lerner* explained, "these 'red flags,' as alleged, [are] insufficient to establish a claim for aiding and abetting fraud because, although they may have put the banks on notice that some impropriety may have been taking place, those alleged facts do not create a strong inference of actual knowledge" of an underlying fraud. 459 F.3d at 294. In the Second Circuit, "New York courts

overwhelmingly recognize that a plaintiff does not satisfy Rule 9(b) by alleging a bank's actual knowledge of a fraud based on allegations of the bank's suspicions or ignorance of obvious 'red flags' or warning signs indicating the fraud's existence." *Rosner v. Bank of China*, No. 06 CV 13562, 2008 WL 5416380, at *6 (S.D.N.Y. Dec. 18, 2008), *aff'd*, 349 F. App'x 637 (2d Cir. 2009).

A few illustrative examples highlight the point. In *In re Agape Litigation*, the court dismissed the aiding and abetting claims because the alleged "red flags" did "not support a strong inference" sufficient "to establish actual knowledge" of the alleged fraud. *In re Agape Litig.*, 681 F. Supp. 2d 352, 362 (E.D.N.Y. 2010) ("*Agape I*"). Similar to here, the Agape plaintiffs then amplified and expanded their factual allegations as a result of "thousands of pages of banking records [] obtained from the Court-appointed Bankruptcy Trustee" and filed an amended complaint. *Agape II*, 773 F. Supp. 2d at 304. Yet, similar again to the action here, the *Agape II* plaintiffs still could only allege constructive knowledge based on red flags and suspicions, which fails under New York law. *Id.* at 310-18. In that case, the court dismissed the amended complaint even where the plaintiffs alleged that specific bank employees received notifications about account activity, reviewed the account frequently, and saw that funds were commingled, large transfers were made, and identically-sized deposits and withdrawals occurred. *Id.* at 309-10. The plaintiffs had even alleged that the defendant bank charged a fee specifically for "actively monitor[ing] and analyz[ing] [the] network of accounts." *Id.* at 310. The court also held that actual knowledge could not be inferred even where there is a "close relationship between a bank employee and the perpetrator of the scheme." *Id.* at 313.

Numerous other cases in New York hold the same. *Rosner* concerned allegations that the bank processed daily transfers and withdrawals of large sums that were "so atypical and non-routine that [the bank] must have had actual knowledge;" the court dismissed (and the Second

Circuit affirmed).  2008 WL 5416380, at *5.  In *Renner v. Chase Manhattan Bank*, the court dismissed (and the Second Circuit affirmed) allegations the bank manager allegedly knew the fraudster was using funds inconsistent with an investment agreement and was wiring those funds instead to his spouse as failing to plead that the bank actually knew of the fraudster's scheme.  *See* No. 98-cv-926, 2000 WL 781081 (S.D.N.Y. June 16, 2000), *aff'd*, 85 F. App'x 782 (2d Cir. 2004). The Second Circuit itself emphasized that allegations giving rise to the inference that a bank "should have known" of a fraud do not suffice in *Heinart v. Bank of America, N.A.*, 835 F. App'x 627 (2d Cir. 2020).  There, the plaintiffs alleged that fraudsters opened more than 120 accounts at two banks and "rapidly shuffled money" between them, commingling investor funds "to cover low or negative balances[.]"  *Id.* at 630-31.  The Second Circuit rejected these allegations as insufficient to plead actual knowledge, noting they amount to "allegations concerning what the Banks should have realized . . .which at most give rise to inferences of constructive knowledge."  *Id.* at 631.  As the Court explained, these "'red flags,' however, are not the same as actual knowledge."  *Id.*

### B.  Plaintiffs fail to plead facts giving rise to a strong inference that Berkshire had actual knowledge of Marshall's scheme.

The allegations in this case offer nothing to deviate from the overwhelming precedent set forth above and further affirmed in *O'Dell*.  Going through each of the allegations proves the point.

#### 1.  There is nothing improper with "commingling" funds within sole proprietorship and personal accounts.

Plaintiffs allege that Berkshire gained knowledge that Marshall was perpetrating a fraud because Marshall commingled money in his personal and "doing business as" accounts.  Compl. ¶¶ 9, 81.  Yet, Plaintiffs concede that Marshall's business accounts were sole proprietorship accounts.  *See e.g.*, *id.* ¶ 5 ("Marshall maintained an account in his individual name at Berkshire Bank . . . along with six other accounts titled in both his individual name and the name of a "doing business as" sole proprietorship.");  ¶ 64 ("he purportedly operated the following unincorporated

businesses as sole proprietorships").[6]  Because Marshall's businesses were sole proprietorships, Marshall was the sole owner of them.  *See Lattanzio v. COMTA*, 481 F.3d 137, 140 (2d Cir. 2007) (A sole proprietorship "has no legal existence apart from its owner."); *U.S. Postal Serv. v. Net, Inc.,* 225 F.R.D. 416, 421 (E.D.N.Y.2005) ("In contrast to a corporation, a sole proprietorship has no separate existence, but rather exists as the so-called 'alter ego' of the owner.").  This is critical because Marshall—as sole owner—had authority to do whatever he wanted with his funds, and any assertions regarding commingling are irrelevant.  Accordingly, there can be nothing suspect about Marshall moving money in his own accounts because "a sole proprietorship and its owner are the same legal entity."  *See Maersk Line A/S v. Carew*, 588 F. Supp. 3d 493, 496 n.1 (S.D.N.Y. 2022).  Plaintiffs' allegations regarding commingling of funds are red herrings.

Further, O'Dell pleaded allegations of commingling of funds, *see O'Dell*, No. 5:24-CV-652, ECF No. 1 ¶ 5 ("Deposits of investors from the Notes issued by Marshall were commingled in the Berkshire Checking Account."); ¶ 50 ("Berkshire monitored and knew of Marshall's colossal commingling of investor funds in the Berkshire Checking Account from the multitude of deposits Marshall made of new investor money"), and the Court held O'Dell failed to plead that Berkshire had actual knowledge of Marshall's Ponzi scheme. *O'Dell*, 2024 WL 4635262, at *4 ("plaintiff's complaint offers speculation as to Berkshire's knowledge based on weak allegations of circumstantial evidence").   Other courts have also routinely rejected allegations of "commingling" of funds as insufficient to establish actual knowledge.  *See Silverman v. Citibank, N.A.*, No. 1:22-CV-5211, 2023 WL 7305243, at *11 n.9 (S.D.N.Y. Nov. 6, 2023) ("actual knowledge of commingling of funds is analogous to actual knowledge of a mere a 'red flag' of

---

[6] The 2301 Account in Marshall's "individual name" was in fact a business account and not a consumer account.  Compl. ¶ 67.

*theft* of those funds"); *Agape II*, 773 F. Supp. 2d at 310 (commingling of investor funds showed at most constructive knowledge of fraud even where bank employees "actually saw" the account activity); *Heinart*, 835 F. App'x at 630-31 (rejecting that allegations that fraudsters opened more than 120 accounts at two banks and "rapidly shuffled money" between them, commingling investor funds "to cover low or negative balances" was sufficient to plead actual knowledge).

### 2. Allegations that Berkshire knew that Marshall was soliciting investments from third parties is insufficient to prove actual knowledge.

Plaintiffs allege Berkshire had knowledge of Marshall's Ponzi scheme because Berkshire knew that Marshall was soliciting investments from third parties and depositing them into his Berkshire accounts. Compl. ¶¶ 12, 14, 82, 86-90, 95. Plaintiffs try to intensify these allegations by including several charts and notations highlighting the transaction activity in Marshall's accounts, which they argue demonstrates Berkshire had actual knowledge of Marshall's fraud. *Id.* ¶¶ 83, 86, 92, 93 95, 98. But again, Plaintiffs fail to explain how knowledge that Marshall was receiving loans or investments from individuals equates to knowledge that Marshall was running a Ponzi scheme. It does not, as courts have ruled. *Yao-Yi v. Wilmington Trust Co.*, 301 F. Supp. 3d 403, 420 (W.D.N.Y. 2017) (allegations bank was aware of high volume of "atypical money transfers" occurring between investor accounts are insufficient to establish actual knowledge).

*Agape II* is again instructive here. In that case, the plaintiffs alleged that a bank had actual knowledge of the fraudsters' Ponzi scheme based on account activity, including "money going in and out of accounts being equal" and "multiple large transfers of over $10,000 each month that required bank approval." *Agape II*, 773 F. Supp. 2d at 310. The plaintiffs in that case also "provide[d] a chart showing the monthly deposits, withdrawals, and end balance for the main Agape account from January 2006 through January 2009." *Id.* The court there found that "while a visual representation of the account activity and actual dollar amounts *in hindsight* may suggest

that the fraud was obvious, it does not change the fact that the Court can only infer that this information raises an inference of [the bank defendants'] constructive knowledge of the fraud." *Id.* (emphasis added)*.* It did not matter that the plaintiffs had alleged that the bank employees "actually saw this account activity" because "without more, [it] does not cross the line from constructive to actual knowledge." *Id.*

Similarly here, Plaintiffs' allegations concerning account activity rely on hindsight and conjecture. By Plaintiffs' own allegations, those accounts had substantial legitimate business running through them, including $42.5MM in inflows and outflows which Plaintiffs helpfully outline in their complaint. Compl. ¶ 83. Given the legitimate business activity, Berkshire would have had no knowledge of a fraud and would have been left guessing what funds were legitimate and non-legitimate. Given the legitimate business, the allegations at worst raise an inference of "constructive knowledge of the fraud." Remarkably and contrary to the law, Plaintiffs think Berkshire should have evaluated Marshall's businesses and determined what account activity was legitimate based on transactions and notations in Marshall's records. *Id.* ("Marshall's legitimate business revenue only represented 28% of the deposits into his Berkshire Bank accounts, and his legitimate business expenses only represented approximately 16% of the disbursements from his Berkshire Bank accounts"); ¶¶ 92, 93. That is not the law. As explained in *Agape II*:

> a conclusory allegation that "no legitimate business" would have the pattern of account activity present in the Agape accounts, and the assertion that the account activity was obviously inconsistent with what [defendant bank] knew about Agape's business "at most indicate only constructive knowledge of a fraudulent scheme, and are insufficient to support a strong inference that [defendant bank] had actual knowledge of the underlying fraud."

773 F. Supp. 2d at 311 (quoting *Rosner*, 2008 WL 5416380, at *6 (holding that factual allegations including that the defendant bank knew from viewing the fraudulent company's accounts that "the repetitive cash withdrawal of all the funds in the disbursing account was plainly inconsistent with

the nature of the account holder's business as a 'currency trader'" did not support the plaintiff's argument the "atypical and non-routine nature" of deposits made it "simply implausible that [the defendant bank] did not have actual knowledge of the underlying scheme")).

The law is clear: "Where, as here, [Berkshire] owes no independent duty to the Plaintiffs, 'even alleged ignorance of obvious warning signs of fraud will not suffice to adequately allege actual knowledge.'" *Id.* at 310 (quoting *Chemtex, LLC v. St. Anthony Enters., Inc.,* 490 F.Supp.2d 536, 547 (S.D.N.Y. 2007)); *see also Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, No. 98 Civ. 4690, 1999 WL 558141, at *1-2, *7-8 (S.D.N.Y. July 30, 2009) (holding that actual knowledge was insufficiently alleged against a bank that allowed a fraudulent company to open multiple accounts through which multi-million dollar transfers, many of which were flagged as fraudulent, were made into the personal account of the supposed business owner); *Mazzaro de Abreu v. Bank of America Corp.*, 525 F.Supp.2d 381, 388 (S.D.N.Y.2007) (finding that while patterns of bank transfers and withdrawals and low account balances were indicative of fraud, such behavior "at most would indicate only constructive knowledge of a fraudulent scheme, and are insufficient to support an allegation that [a bank] had actual knowledge of an underlying fraud"); *Nathel v. Siegal*, 592 F.Supp.2d 452, 469 (S.D.N.Y.2008) ("Even where a bank was on notice of 'red flags' that indicated certain accounts may have been vehicles for fraudulent activity and referred the case to its internal fraud unit, the bank had only suspicions but not actual knowledge of fraud."). As stated in *O'Dell*, "the mere fact that defendant *should* have known Marshall was conducting a Ponzi scheme is insufficient to demonstrate actual knowledge for purposes of a common law claim of aiding-and-abetting fraud." 2024 WL 4635262, at *4.

### 3.   NBT Bank never provided Berkshire with actual knowledge of a Ponzi scheme.

Plaintiffs next allege that Berkshire had knowledge of Marshall's Ponzi scheme because NBT Bank warned Berkshire that Marshall "may be running a Ponzi scheme" in an email sent to Berkshire on October 18, 2021.  Compl. ¶¶ 4, 15, 91, 92, 94, 99, 101.  But the rest of the email chain shows Berkshire asking for NBT to send it information about these concerns—"[t]he more the better."  *See* Ex. A, Email with NBT Bank.[7]  There was no further response from NBT.

Plaintiffs imply Berkshire received this warning from NBT Bank at the time Marshall was allegedly "forced out" of NBT in 2015 and then became a customer of Berkshire.  *See* Compl. ¶ 4.  However, NBT informed Berkshire that Marshall "may be running a Ponzi scheme" on October 18, 2021—six years after Plaintiffs allege Marshall became a customer of Berkshire.

Additionally, courts have found that a warning from a third party about potentially fraudulent activity is not enough to demonstrate a bank's actual knowledge of fraud.  In *Agape II*, the court found that a bank did not have actual knowledge of a fraudulent scheme even though an investor had furnished evidence of the fraud to the bank's vice president, and the bank had separately been made aware of the customer's report as made to the Office of the Comptroller of the Currency.  773 F. Supp. 2d at 320-21.  Similarly, in *Kolbeck*, the court held that a bank did not have knowledge of the fraud even though non-clients had claimed a fraud and demanded that the bank liquidate the fraudsters' accounts. 939 F. Supp. at 247-48.  The court reasoned that a bank "cannot be charged with knowledge of [the fraudster's] misconduct simply because they had knowledge of accusations against him, without more."  *Id.* at 248.  Finally, in *Ryan v. Hunton & Williams*, the court found that a bank's suspicions of fraud that resulted in both an investigation and termination of the accounts amounted only to "suspicions—not actual knowledge—of

---

[7] Allegations related to NBT's warning to Berkshire are integral to the Complaint. *See supra* n.2.

fraudulent activity." No. 99 Civ. 5938, 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000).  Here too, NBT Bank's warning did not provide Berkshire with actual knowledge of Marshall's fraud, particularly when NBT failed to follow up with any evidence and Berkshire's own independent investigation *did not find any evidence of a Ponzi scheme*.  *See* Compl. ⁋⁋ 17, 103 (Berkshire "currently do[es] not see signs of any account being used as a Ponzi scheme.  Account activity appears to be reasonable").

### 4. BSA Alerts did not provide Berkshire with actual knowledge of Marshall's Ponzi scheme.

Plaintiffs allege Marshall's account activity triggered numerous BSA and other alerts on Berkshire account activity monitoring systems from at least 2017 through 2023 and these alerts provided Berkshire with actual knowledge of Marshall's Ponzi scheme.  Compl. ⁋⁋ 13, 82, 85, 86, 99.  However, Plaintiffs omit that all of the quoted alerts in paragraph 86 were resolved with conclusions that the account activity was reasonable, normal, or not suspicious.  *See supra* at 6-8.  Furthermore, conclusory allegations about Berkshire's BSA alerts are not sufficient to demonstrate actual knowledge of fraud by Berkshire.  *See O'Dell*, 2024 WL 4635262, at *3 (rejecting allegations that Berkshire had actual knowledge of Marshall's Ponzi scheme because of Berkshire's AML obligations and compliance procedures").

Plaintiffs make hay over the fact that an internal investigation report includes an entry from June 2024 confirming that Berkshire "currently do[es] not see signs of any account being used as a Ponzi scheme" and that "[a]ccount activity appears to be reasonable." Compl. ⁋⁋ 17, 103.  Rather than a "retroactive 'papering over'" as Plaintiffs allege, *id.*, all this shows is that Berkshire was diligent in reviewing Marshall's accounts after the O'Dell complaint was filed on May 13, 2024.  *O'Dell*, No. 5:24-CV-652, ECF No. 1.  Moreover, the review is consistent with Berkshire's

previous investigations and conclusions for each of the alerts quoted by Plaintiffs in paragraph 86.[8]

Relatedly, Plaintiffs argue that Berkshire's due diligence and KYC would have revealed Marshall's fraudulent conduct to Berkshire, particularly because Marshall was flagged as a high-risk customer. *See e.g.*, Compl. ¶¶ 6, 63, 70, 108, 129. *O'Dell* rejected this same argument. 2024 WL 4635262, at *3 ("While plaintiff has alleged in general terms that Berkshire had numerous internal controls, legal obligations, and oversight mechanisms in place to detect and impede fraudulent activity, plaintiff has not plausibly alleged non-conclusory facts that would somehow permit a 'strong inference' that defendant possessed actual knowledge or fraudulent intent."); *see also Agape II*, 773 F. Supp. 2d at 311(rejecting allegations that bank's "due diligence conducted in conjunction with the opening of Cosmo's accounts . . . combined with the account activity"— including commingling of funds and frequent deposits and withdrawals of identical amounts— must have given rise to actual knowledge); *accord Heinert v. Bank of America, N.A.*, 410 F. Supp. 3d 544, 551 (W.D.N.Y. Oct. 18, 2019) ("Even assuming *arguendo* that each institution's 'account opening practices' would, as plaintiffs allege, have alerted the defendant banks to the fact that the accounts at issue were comprised of investor funds, there is no indication that the defendant banks had actual notice that the individual defendants . . . were using their accounts to perpetrate fraud."). Plaintiffs have failed to plead that Berkshire's due diligence resulted in it gaining actual knowledge that Marshall was conducting a Ponzi scheme.

### 5.  Large cash transactions do not provide actual knowledge of a Ponzi scheme.

Plaintiffs further allege that Berkshire knew Marshall was running a Ponzi scheme because

---

[8] Complaints about redactions related to Berkshire's produced reports are misplaced as federal law requires banks to redact information disclosing the existence or lack thereof of a Suspicious Activity Report.  31 U.S.C. § 5318(g)(2)(A)(i); 12 C.F.R. §21.11(k); 31 CFR § 1020.320(e).

Berkshire filed 41 CTRs for Marshall.  Compl. ¶¶ 66, 96, 97, 98.  CTRs are filed when an individual makes a cash deposit exceeding $10,000.  But knowledge of large cash transactions does not demonstrate knowledge of a Ponzi scheme.  Moreover, Marshall ran a rental business as a sole proprietorship, *id.* ¶ 64, and Plaintiffs quote in their Complaint that Berkshire had repeatedly concluded that the "cash deposits are most likely rental payments as well as investment money," *id.* ¶ 86.  And, as stated earlier, those alerts were resolved with conclusions that Marshall's account activity was reasonable.  What's more, even if there were anything suspicious about Marshall's cash deposits, courts have repeatedly held that suspicious activity or red flags are insufficient to demonstrate actual knowledge.  *See, e.g., Mazzaro,* 525 F.Supp.2d at 388.

### 6. A large business in a small town does not provide actual knowledge of fraud.

Plaintiffs allege that because Marshall's businesses were in a small town, Berkshire would have known that Marshall was committing a Ponzi scheme.  Compl. ¶¶ 65, 66, 99.  Likewise, Plaintiffs allege that because Marshall was in a small town, the Berkshire branch employees somehow knew Marshall's employees "on a personal level."  *Id.*  Yet, Plaintiffs provide no allegations that any of Marshall's employees were aware of the Ponzi scheme.  Further, Plaintiffs provide no additional evidence for the illogical leap to conclude that Berkshire had actual knowledge of Marshall's Ponzi scheme based on Marshall being in a small town or Berkshire's employees knowing Marshall's employees.  Moreover, *O'Dell* addressed such allegations and found that "while Marshall possessed the largest account and had personal relationships with some of the bank tellers at the branches he frequented, the fact that Marshall engaged in fraudulent activity does not, by itself, amount to Berkshire possessing knowledge of the fraud."  *O'Dell*, 2024 WL 4635262, at *3.  Other courts have reached the same conclusion.  *See, e.g.*, *Lerner*, 456 F.3d at 281 (finding no actual knowledge of Ponzi scheme where perpetrator had close relationship with

bank's branch manager and this bank employee bent rules for perpetrator, who was largest source of deposits at bank branch, by initially allowing overdrafts on his account); *Agape II*, 773 F. Supp. 2d at 316-17 (finding bank employee's "frequent lunch meetings with [the fraudster] where they discussed his business and the accounts" had "fail[ed] to raise an inference of actual knowledge")

### C. Plaintiffs fail to show Berkshire provided substantial assistance to Marshall's fraud.

Even if Plaintiffs could show actual knowledge by Berkshire of Marshall's Ponzi scheme, their claims would still fail because they cannot demonstrate substantial assistance. Substantial assistance requires that "(1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed; and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Agape II*, 773 F. Supp. 2d at 322 (quoting *Rosner*, 2008 WL 5416380, at *5) (internal citations omitted). Importantly, "[w]hen a defendant has no affirmative duty to act, their failure to act may not serve as the basis for claiming that the defendant provided substantial assistance." *Id.*

Plaintiffs allege, similarly to *O'Dell*, that Berkshire provided substantial assistance to Marshall's Ponzi scheme because it continued to provide Marshall with ordinary banking services. Compl. ¶¶ 19, 109. But the *O'Dell* court rejected such an allegation as demonstrating substantial assistance. *O'Dell*, 2024 WL 4635262, at *4 ("Indeed, courts in this Circuit have repeatedly held that a bank employee's provision of services, its opening accounts and approving transfers, or a bank's failure to investigate red flags do not constitute substantial assistance.").

Plaintiffs raise a new allegation that Berkshire provided substantial assistance because it provided Marshall with a remote scanner which enabled Marshall to remotely deposit up to $300,000 in checks per day. Compl. ¶¶ 16, 94, 130. But as held in *Agape II*, where the plaintiffs also alleged that the bank "provided substantial assistance by recommending and implementing"

a remote depository system that allowed for large check deposits, "Plaintiffs offer no factual support" for the characterization that providing remote deposit access to a customer with multiple sole proprietorship businesses equals substantial assistance in a Ponzi scheme. 773 F. Supp. 2d at 324. "[S]uch conclusory allegations cannot satisfy the Plaintiffs' burden of alleging substantial assistance with the requisite particularity." *Id.*[9]

### D. Plaintiffs' Claim for Aiding and Abetting Breaches of Fiduciary Duty also fails because Plaintiffs have not pleaded that Marshall owed any fiduciary duties.

Plaintiffs' claim against Berkshire for aiding and abetting breaches of fiduciary duties fails for the independent reason that Plaintiffs have not pleaded that Marshall had any fiduciary duties.

To state a claim for breach of fiduciary duty, plaintiff must allege "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 206 (S.D.N.Y. 2014). "A fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Roni LLC v. Arfa*, 963 N.E.2d 123, 124 (N.Y. 2011). "The core of a fiduciary relationship is a 'higher level of trust than normally present in the marketplace between those involved in arm's length business transactions.'" *Faith Assembly v. Titledge of N.Y. Abstract, LLC,* 961 N.Y.S.2d 542, 553 (2013) (citation omitted).

Plaintiffs make conclusory allegations that Marshall "owed a fiduciary duty" to his clients, Compl. ¶¶ 137-44, which is not enough to plausibly plead a fiduciary relationship. *Hussein v. Bank of America, N.A.*, No. 24-CV-4477, 2025 WL 2783108, at *4 (E.D.N.Y. Sept. 30, 2025) (finding

---

[9] Any argument by Plaintiffs that Berkshire was motivated to substantially assist Marshall due to fees it charged for ordinary banking services, Compl. ¶¶ 20, 21, 110, is not sufficient under the law. *See e.g.*, *Agape II*, 773 F. Supp. 2d at 321-22 ("fees paid to [defendant bank] . . . do not provide a basis for showing the motive required to successfully allege a strong inference of fraud").

plaintiff's pleadings conclusory where plaintiff did "not otherwise plead facts establishing that Bank of America entered an agreement creating 'a duty to act for or to give advice for the benefit of' plaintiff"), *appeal filed*, No. 25-2403 (2nd Cir. Oct. 2, 2025); *see also AHA Sales, Inc. v. Creative Bath Prods., Inc.*, 867 N.Y.S.2d 169, 181 (App. Div. 2008) (explaining that a "conventional business relationship," absent a showing of special circumstances, "is insufficient to create a fiduciary relationship."). To the contrary, Plaintiffs allege the relationship between Marshall and the investors was governed by notes. Compl. ¶¶ 24-25. Where a contract governs the relationship between parties, fiduciary duty claims based on "the same facts that underlie the contract obligations" are "foreclosed as superfluous." *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010). So it is here: any fiduciary claims regarding the notes are foreclosed by the note contracts and thus cannot form the basis for an aiding and abetting breach of fiduciary duty claim.

### E. Plaintiffs fail to plead an unjust enrichment claim because Berkshire did not receive a benefit at Plaintiffs' expense.

Plaintiffs' unjust enrichment claim fails too. "The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Pauwels*, 83 F.4th at 186 (quoting *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2nd Cir. 2004)). "[U]njust enrichment cannot be supported if the connection between the parties is too attenuated." *In re Stillwater*, 2018 WL 1610416, at *12.

Plaintiffs' unjust enrichment claim fails because Plaintiffs cannot demonstrate that any benefit that Berkshire received was "at plaintiff[s'] expense." *See Zim Am. Integrated Shipping Servs., Co., LLC v. Sportswear Grp., LLC*, No. 20-cv-4838, 2021 WL 5450117, at *7 (S.D.N.Y. Nov. 18, 2021) (holding "there must exist a relationship or connection between the parties that is not too attenuated" for plaintiff to state an unjust enrichment claim) (citation omitted). First, the

fees that Berkshire allegedly collected were collected from Marshall, not from Plaintiffs. Thus, any benefit that Berkshire may have received from providing ordinary banking services came from Marshall's account. That Plaintiffs may have provided Marshall money, and that that such was in Marshall's account when Berkshire collected fees from Marshall, is simply too attenuated to form the basis of an unjust enrichment claim, or to show that Berkshire was enriched at Plaintiffs' expense. *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (holding "indirect benefit" could not "establish the specific and direct benefit necessary to support an unjust enrichment claim").

Relatedly, Plaintiffs have failed to plead any facts that indicate some relationship between the parties that could have caused reliance or inducement. *Mandarin Trading, Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011) (unjust enrichment claim must plead some relationship between the parties that could have caused reliance or inducement). Although Plaintiffs have pleaded that Berkshire was aware Marshall was soliciting investments from third parties, Compl. ¶¶ 12, 14, 82, 86-90, 95, mere allegations of awareness that the other party exists are not sufficient. *Georgia Malone & Co., Inc. v. Rieder*, 973 N.E.2d 743, 747 (N.Y. 2012). The parties must have actually had relevant dealings with each other. *Id.* (finding relationship "too attenuated because [the parties] simply had no dealings with each other."); *Sperry v. Crompton Corp.,* 863 N.E.2d 1012 (N.Y. 2007) (holding plaintiff must allege sufficiently close relationship with other party).

Here, Plaintiffs have alleged no interaction between the noteholders and Berkshire. Accordingly, Plaintiffs' unjust enrichment claim fails under New York law. *Cf. Hesse v. Godiva Chocolatier, Inc.*, 463 F.Supp.3d 453, 473 (S.D.N.Y. 2020) (explaining an unjust enrichment claim is not a "catchall cause of action to be used when others fail.") (citation omitted).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Berkshire respectfully requests the Court dismiss the Complaint.

Respectfully submitted,

**MCGUIREWOODS LLP**

*s/ Megan D. Price*
Megan D. Price
Jarrod D. Shaw (*admitted pro hac vice*)
Nellie E. Hestin (*admitted pro hac vice*)
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222
Phone: (412) 667-6000
mprice@mcguirewoods.com
jshaw@mcguirewoods.com
nhestin@mcguirewoods.com

*Attorneys for Defendant Berkshire Bank*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 30th day of October 2025, I caused a true and correct copy of Defendant Berkshire Bank's Notice of Motion and Memorandum of Law in Support of Motion to Dismiss Plaintiffs' Complaint to be electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send notification of such filing to all counsel of record in this action.

*/s/ Megan D. Price*
Megan D. Price
